### PLATT *v.* UNION PACIFIC RAILROAD COMPANY.

1. By the third section of the act of Congress approved July 1, 1862 (12 Stat. 489), incorporating the Union Pacific Railroad Company, lands were granted to the company. "for the purpose of aiding in the construction of the railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores thereon," and it was enacted that all such lands "not sold or disposed of" by the company before the expiration of three years after the completion of the entire road should be subject to settlement and pre-emption, like other lands. Upon a consideration of this and other provisions of the act and of the amendatory act of July 2, 1864 (13 id. 356), — *Held*, 1. That these provisions should be so construed as to effect their primary object, which was to furnish aid in and during the construction of the road, and that it cannot be controlled or defeated by the secondary and subordinate purpose of opening to settlement and pre-emption such of the lands as should not be sold or disposed of within the designated period. 2. That the words "or disposed of" are not redundant, nor are they synonymous with "sold," but they contemplate a use of the lands granted different from the sale of them, and that a mortgage of them is such a use. 3. That the mortgage of them executed by the company April 16, 1867, for the purpose of raising money necessary to continue and complete the construction of the road, disposed of them within the meaning of the act, and was authorized thereby. 4. That the mortgage was an hypothecation of the fee, and not merely of an estate determinable at the expiration of three years from the completion of the road, and the debt it was given to secure not having matured, the lands are not subject to pre-emption. *Sed quære,* whether the remnants that may be unsold when the mortgage debt shall be paid will not then be subject to pre-emption.
2. In construing a statute, aid may be derived from attention to the state of things as it appeared to the legislature when the statute was enacted.

APPEAL from the Circuit Court of the United States for the District of Nebraska.

This was a bill in equity filed Sept. 28, 1878, by William H. Platt, to enjoin the Union Pacific Railroad Company from prosecuting an action of ejectment which it brought against him the twenty-third day of that month, for the recovery of a certain quarter-section of land situate in the county of Hall and State of Nebraska, whereof he was in possession, claiming the equitable title thereto. The company answered. The case was heard upon the pleadings, and the bill dismissed. Platt appealed here.

Platt entered upon the land in the year 1874, and thereafter

remained in possession.   He made improvements thereon, and performed all the conditions which entitled him, as a qualified pre-emptor, to a preference right of purchase, if the land were subject to pre-emption.   He duly filed,. Sept. 21, 1878, his declaratory statement, made the requisite proofs before the proper officers, paid the receiver of the local land-office $200, being at the rate of $1.25 per acre, and took a receipt therefor.

The land is part of an odd-numbered section, situate within ten miles of the road of the company, and is included in the grant made by the act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, &c., approved July 1, 1862 (12 Stat. 489), and the amendatory act of July 2, 1864 (13 Stat. 356).   The company accepted the grant, located the route of its road and filed a map thereof within the requisite time, and, in order to raise the means necessary to continue and complete the work on its road which was then constructing, issued, April 16, 1867, its coupon bonds to the amount of $10,400,000, payable twenty days after the date thereof, with semi-annual interest.   To secure the payment of them it executed and duly acknowledged a certain indenture of that same date, covering the granted lands, which it caused to be recorded in said Hall County before July 1, 1872.   The United States issued a patent, bearing date March 26, 1875, to the company for the granted lands not theretofore conveyed to it.

The company refused to accept the money so paid by Platt to the receiver of the land-office.

· The bill and answer set up different dates when the road was completed; the first alleging it to be before July, 1869, and the latter Nov. 14, 1874, when it was finally accepted by the government.

The act of 1862 provides as follows: —

"SECT. 3.  And be it further enacted, that there be and is hereby granted to the said company, for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores thereon, every alternate section of public land, designated by odd numbers, to the amount of five alternate sections

per mile on each side of said railroad, on the line thereof, and within the limits of ten miles on each side of said road, not sold, reserved, or otherwise disposed of by the United States, and to which a preemption or homestead claim may not have attached, at the time the line of said road is definitely fixed: *Provided*, that all mineral lands shall be excepted from the operation of this act; but where the same shall contain timber, the timber thereon is hereby granted to said company. And all such lands so granted by this section which shall not be sold or disposed of by said company within three years after the entire road shall have been completed, shall be subject to settlement and pre-emption like other lands, at a price not exceeding $1.25 per acre to be paid to said company.

"SECT. 4. And be it further enacted, that whenever said company shall have completed forty consecutive miles of any portion of said railroad and telegraph line ready for the service contemplated by this act, and supplied with all necessary drains, culverts, viaducts, crossings, sidings, bridges, turnouts, watering-places, depots, equipments, furniture, and all other appurtenances of a first-class railroad, — the rails and all the other iron used in the construction and equipment of said road to be American manufacture of the best quality, — the President of the United States shall appoint three commissioners to examine the same and report to him in relation thereto; and if it shall appear to him that forty consecutive miles of said railroad and telegraph line have been completed and equipped in all respects as required by this act, then, upon certificate of said commissioners to that effect, patents shall issue conveying the right and title to said lands to said company, on each side of the road, as far as the same is completed, to the amount aforesaid; and patents shall in like manner issue as each forty miles of said railroad and telegraph line are completed upon certificate of said commissioners." . . .

The amendatory act changes the number of sections per mile granted by the third section of the original act from "five" to "ten," and the limits of the grant from "ten" to "twenty," miles on each side of the road; and declares the company to be entitled to patents, upon the construction and acceptance of each "twenty" consecutive miles of road.

The act of 1862 provides that upon the completion of forty consecutive miles (changed to twenty by the act of 1864) of said road, bonds of the United States of $1,000 each, bearing

six per cent semi-annual interest, due at thirty years from date, shall be issued by the Secretary of the Treasury to the company, to the amount of sixteen bonds per mile (a larger amount per mile being allowed between certain designated points); and that " to secure the repayment to the United States, as hereinafter provided, of the amount of the said bonds so issued and delivered to said company, together with all interest thereon which shall have been paid by the United States, the issue of said bonds and delivery to the company shall *ipso facto* constitute a first mortgage on the whole line of the railroad and telegraph, together with the rolling-stock, fixtures, and property of every kind and description, and in consideration of which said bonds may be issued; and on the refusal or failure of said company to redeem said bonds or any part of them when required so to do by the Secretary of the Treasury, in accordance with the provisions of this act, the said road, with all the rights, functions, immunities, and appurtenances thereunto belonging, and also all lands granted to the said company by the United States which at the time of said default shall remain in the ownership of the said company, may be taken possession of by the Secretary of the Treasury for the use and benefit of the United States: *Provided*, this section shall not apply to that part of any road now constructed."

The tenth section of the act of 1864 provides that sect. 5 of the act of 1862 " be so modified and amended that the Union Pacific Railroad Company, the Central Pacific Railroad Company, and any other company authorized to participate in the construction of said road, may, on the completion of each section of said road, as provided in this act and the act to which this act is an amendment, issue their first-mortgage bonds on their respective railroad and telegraph lines to an amount not exceeding the amount of the bonds of the United States, and of even tenor and date, time of maturity, rate and character of interest, with the bonds authorized to be issued to said railroad companies respectively. And the lien of the United States bonds shall be subordinate to that of the bonds of any or either of said companies hereby authorized to be issued on their respective roads, property, and equipments, except as to the provisions of the sixth section of the act to

which this act is an amendment, relating to the transmission of despatches and the transportation of mails, troops, munitions of war, supplies, and public stores for the government of the United States. And said section is further amended by striking out the word ' forty ' and inserting in lieu thereof the words ' on each and every section of not less than twenty.' "

The indenture executed by the company to secure its bonds conveys in fee to trustees, upon certain trusts, terms, and conditions, the lands granted to it by the acts of Congress. One condition is, " that if the said party of the first part shall well and truly pay, or cause to be paid, to the holders of the said bonds, and every of them, the principal sums of money therein mentioned, according to the tenor thereof, with the interest thereon, at the times and in the manner hereinbefore provided, according to the true intent and meaning of these presents, then and from thenceforth this indenture and the estate hereby granted shall cease and determine, and all the right, title, and interest in any and all property hereby conveyed to the parties of the second part, not then disposed of under the powers hereby conferred, shall revert to and vest in the said party of the first part."

It further provides that the lands shall be under the management and control of the company, to be by it sold or contracted to be sold for such prices and on such terms of payment as shall be mutually agreed upon by the company and the trustees ; that the trustees shall, upon payment of the purchase-money of the several tracts which may be sold, receive and apply the same, and the proceeds of all sales made by them of lands so conveyed to them, to the sole and exclusive purpose of the payment of the said coupon bonds, until the same and the whole thereof shall be fully paid and satisfied, and thereafter to reconvey to the company the residue of said lands remaining unsold ; that in default of the payment of either the interest or principal of the said coupon bonds, according to the tenor and effect thereof, for the period of six months after demand at the place of payment, the trustees are authorized to enter into and take possession of the lands and foreclose the indenture ; that in case of such default for the period of one year, then the principal sum of said bonds is to

become due and payable, and the said trustees are authorized to take possession of the lands, foreclose said indenture by selling, at public auction in the city of Omaha or New York, the lands, or so much thereof as may be necessary to pay and discharge said coupon bonds, or so many thereof as are then outstanding and unpaid ; and that in case of any sale upon any such foreclosure, or at any public auction, the trustees are empowered to make, execute, and deliver a conveyance of the lands so sold, which shall convey to the purchaser all the rights and privileges of the company in and to the property so sold, to the same extent as the company shall have previously enjoyed and held the same.

The indenture further declares " that all the provisions of said acts of Congress, so far as they are applicable, are hereby made, and shall be deemed and taken to be, a part of this instrument, and the said provisions in all that concerns the sale and disposal of the said lands hereby conveyed to the parties of the second part are to be observed and strictly and faithfully carried out and fulfilled."

The company has made no sale or disposition of the land in controversy otherwise than by said indenture, and bonds to the amount of $7,000,000 are still outstanding.

*Mr. James Lowndes* for the appellant.

*The Attorney-General* for the United States.

The controlling question is, Had the United States the right to sell, in accordance with the provisions of the pre-emption laws and at the minimum price, the tract of land involved in this controversy ?  In disposing of it, it is not important to determine at which of the dates alleged by the respective parties the road was completed, as, at the time of the appellant's entry, more than three years had elapsed from the date claimed by the company as that when the road was accepted.

No sale or disposition of the land within the meaning of the act has been made by the company.  It may be that " dispose of " has not such an exact and universally accepted technical meaning as " sell," " exchange," " mortgage."  It popularly signifies " to sell."  Webster's definition is, " to exercise finally one's power of control over; to pass over into the control of

some one else; to alienate; to bestow; to part with; to get rid of." Worcester's is, "put out of possession of."

Every one of these definitions points to a transfer of title and ownership as the essential signification of the word. Its usual technical meaning is "to sell." A general devise with power to dispose of carries the fee. 2 Redf. Wills, 334, note. A devise with power of disposition gives power to convey the fee. *Lyon* v. *Marsh*, 116 Mass. 232; *Ellston* v. *Schilling*, 42 N. Y. 79.

It was not the effect nor the intent of the indenture to transfer the title or the ownership of the lands. Its effect must be determined by the law of the State where the lands are situated (*United States* v. *Crosby*, 7 Cranch, 115; *Clark* v. *Graham*, 6 Wheat. 577; *McGoon* v. *Scales*, 9 Wall. 23); and in deciding upon it this court conforms to the decisions of the State court. *Hinde* v. *Vattier*, 5 Pet. 398.

The statutes of Nebraska enact that " in the absence of stipulations to the contrary the mortgagor of real estate retains the legal title and right of possession thereof " (Gen. Stat. 1873, sect. 55, p. 881); and not only her courts, but those of the respective States where the granted lands lie, hold that a mortgage conveys no title or right of possession. It merely creates a lien to be enforced by action. *Kyger* v. *Ryley*, 2 Neb. 20; *Chick* v. *Willetts*, 2 Kan. 384; *Waterson* v. *Devoe*, 18 id. 223; *Drake* v. *Root*, 2 Col. 685; *Hyman* v. *Kelly*, 1 Nev. 179; *Johnson* v. *Sherman*, 15 Cal. 287; *Goodnow* v. *Ewer*, 16 id. 461; *Dutton* v. *Warschauer*, 21 id. 609.

The indenture, so far from stipulating that the legal title and right of possession shall not remain in the company, provides that the latter shall have the exclusive control of the lands, and full power and authority to make contracts for the sale of them at such prices as it and the trustees may agree upon. It thus appears that nothing but a lien on the lands was created, which is not a *jus ad rem*, but simply a charge upon them, binding them with no greater force and effect than an ordinary judgment, or an assessment against them for taxes. The company concedes the non-transfer of them. It alleges, in the action of ejectment, that it is the owner, seised in fee of the tract in question and entitled to the possession thereof.

In ascertaining the meaning of the act subjecting the lands to pre-emption, on the failure of the company to sell or dispose of them within a specific period, we may recur to the history of the times, to the surrounding circumstances, the preceding legislation touching the public domain, and to the apprehended mischief which Congress sought to avert. *Rhode Island* v. *Massachusetts*, 12 Pet. 657, 723; *Maryland* v. *Railroad Company*, 22 Wall. 105; *United States* v. *Union Pacific Railroad Co.*, 91 U. S. 72.

These have been considered by this court in *Railway Company* v. *Prescott*, 16 Wall. 609, and the case shows that the construction for which the company now contends would, if practically carried out, defeat the settled policy of the government, and exclude from pre-emption an immense body of lands, the settlement of which Congress designed to facilitate and expedite.

If creating the lien on the lands is disposing of them, then the company has complied with the requirement of Congress. The extinguishment of the lien by the payment of the debt would not render them subject to settlement under the pre-emption laws.

Counsel may insist that our construction does not give effect to " or." The word does not necessarily imply that the terms between which it is found are alternatives. Worcester remarks that there is no word in the language of more equivocal import. It is often used to connect equivalent expressions. Such is the case here.

The indenture, by providing that the provisions of the act in all that concerns the sale and disposal of the land shall be deemed and taken as a part of the instrument, stipulates, if our construction be correct, that the lands shall, at a given time, be subject to pre-emption at $1.25 per acre. This can work no hardship as the avails of the sales would be paid to the company, and the holders of the bonds purchased them with knowledge of the conditions of the grant.

Platt has met the requirements of the pre-emption laws, and has a complete equitable right to the land. *Frisbie* v. *Whitney*, 9 Wall. 187; *Hutchings* v. *Low*, 15 id. 77; *Shepley et al.* v. *Cowan et al.*, 91 U. S. 330; *Moore* v. *Robbins*, 96 id.

530. He is, therefore, entitled to relief. The failure of the company to sell within the appointed time vested the legal title to the lands in the United States, or if this court holds that such title still abides in the company, then the latter holds it as the trustee of parties entitled to pre-emption under the acts of Congress, and those acts can be executed only by the officers of the government.

*Mr. Sidney Bartlett* and *Mr. Samuel Shellabarger, contra.*

MR. JUSTICE STRONG delivered the opinion of the court.

If it be conceded that the complainant has complied with all the conditions prescribed by the acts of Congress for the acquisition by a pre-emptioner of an equitable title to a portion of the public lands, the question still remains, whether the land which he claims was open to pre-emption when his settlement was made. It is confessedly a part of the lands which the United States granted to the Union Pacific Railroad Company by the act of July 1, 1862. 12 Stat. 489.

The third section [1] of the act contains words of present grant, but the fourth section enacted that on the completion of each successive forty miles of the railroad and telegraph line, patents should be issued, " conveying the right and title to said lands to said company, on each side of the road, as far as the same is completed, to the amount aforesaid." The seventh section required the road and telegraph to be completed before the first day of July, 1874. The amending act of July 2, 1864 (13 Stat. 356), enlarged the grant, but made no change in its terms; and the Secretary of the Interior, as directed by the act, withdrew the lands within fifteen miles of the designated route of the road from pre-emption, private entry, and sale.

Such was the grant. The railroad and telegraph line were entirely completed before July 1, 1874 (if not in 1869), and patents for all the lands granted were directed to be issued to the company in November of that year. By force of the grant, however, and by the definite fixing of the route of the road, and the filing the map thereof in the Interior Department, as required by law, together with the completion of the road westward and beyond the tract claimed by the complainant, the

[1] *Supra,* p. 49.

title to that tract had become vested in the company before April 16, 1867.   On that day the company, for the purpose of raising money necessary to continue and complete the construction of their road, issued their coupon bonds for the sum in the aggregate of $10,400,000, bearing seven per cent interest, and payable in twenty years from their date.   On the same day, for the purpose of securing the payment of the bonds, the company executed a mortgage or deed of trust to trustees of all and several the several sections of land granted to them by the said acts of Congress, including the tract claimed by the complainant.   The instrument, we think, though in form a deed of trust, was substantially a mortgage.   It was delivered to the trustees, and duly recorded.   The bonds were sold in different markets to *bona fide* purchasers, and they are now outstanding, about $7,000,000 still remaining unsatisfied.   All this was before the entire road was completed, and before the first step was taken by the complainant to obtain his pre-emption right.

In view of these facts, we are to determine whether the mortgage was a disposition of the lands granted to the company within the meaning of the last clause of sect. 2 of the act of 1862.   If it was, the tract of land claimed by the complainant was not open to settlement and pre-emption when he entered thereon, nor has it been at any time since.   That clause declared that " all the lands granted by the section, which shall not be sold or disposed of by said company within three years after the entire road shall have been completed, shall be subject to settlement and pre-emption," &c.   Was the mortgage a sale or disposition of the lands as understood by Congress?   That the company had power to mortgage the lands admits of no reasonable doubt.   It may be conceded that a railroad company has not power either to sell or mortgage its franchise, or perhaps the road which it has been chartered to build, without express legislative authority, and this has in some cases been decided.   The reason is that such a sale or mortgage tends to defeat the purposes the legislature had in view in the grant of the charter.   The adventurers who obtain the charter and who accept it undertake to construct and maintain the public work. Their undertaking is the consideration of the grant, and with-

out legislative consent they cannot throw off the obligation they have assumed. But the reason is inapplicable to a sale or mortgage of property which is not a part of the road and in no way connected with its use. Parting with such property or incumbering it in no degree interferes with the performance of the duties of the company to the public. Railroad companies are not usually empowered to hold lands other than those needed for roadway and stations, or water privileges. But when they are authorized to acquire and hold lands separate from their roads, the authority must include the ordinary incidents of ownership, — the right to sell or to mortgage. Especially is this so when, as in the present case, the lands have been granted to the company by the legislature that granted the charter, without any restriction of their use.

Assuming, therefore, as we must, and as has been tacitly conceded in the argument, that the company had the power to make the mortgage of 1867, we need not stop to inquire whether it was a sale or a partial sale. In some of the States, as well as in England, a mortgage is practically, as well as in form, a sale. It passes the legal title to the mortgagee. The more general modern doctrine in this country is, we admit, that it creates merely a lien, without any transmission of title. But if not a sale, was the mortgage made by the company defendant in this case not a disposition of the lands granted to it by Congress? This question is not to be answered by reference to definitions given in the dictionaries. What did Congress mean in the act of 1862? That something else than sale, either total or partial, was intended we are required by all the rules of construction to conclude. Congress is not to be presumed to have used words for no purpose. If it was intended that only lands which had been sold before three years had expired after the entire completion of the railroad should be exempted from pre-emption, the words " or disposed of " were entirely superfluous. But the admitted rules of statutory construction declare that a legislature is presumed to have used no superfluous words. Courts are to accord a meaning, if possible, to every word in a statute. In *Commonwealth* v. *Alger* (7 Cush. (Mass.) 53–89), it was said that in putting a construction upon any statute every part must be regarded, and it must be so expounded, if

practicable, as to give some effect to every part of it. So, in *People* v. *Burns* (5 Mich. 114), it was held that some meaning, if possible, must be given to every word in a statute, and that where a given construction would make a word redundant, it was reason for rejecting it. To the same effect is *Dearborn and Others* v. *Inhabitants of Brookline* (97 Mass. 466) ; and in *Gates* v. *Salmon* (35 Cal. 576) it was ruled that no words are to be treated as surplusage or as repetition. The phrase " or disposed of " must, therefore, have some distinctive meaning, some meaning beyond the word " sold." What that is may be seen very plainly when the whole act of 1862 is examined. We are seeking for the intention of Congress, and to discover that we may look at the paramount object which Congress had in view, as well as the means by which it proposed to accomplish that object. Congress addressed itself to the work of securing a railroad from the Missouri River to the western boundary of the Territory of Nevada, and thence to the Pacific Ocean. The work was vast, beyond the reach of private capital or enterprise. It could be accomplished only by the bestowal upon a corporation of very large governmental aid. The proposed road ran over mountains and through what was known to be an uninhabited desert, for more than a thousand miles. The lands through which it must pass were supposed to be almost worthless, and quite unsalable, until they should be made, by the construction of a railroad, accessible to settlers and to Eastern markets. The construction of a railroad through such a region was most uninviting to private capitalists. To induce them to embark in the enterprise was the overshadowing motive that dictated the act of 1862. This is apparent in almost every line of the act. For this reason the grants of land were made, the rights of way and of taking materials were given, and the subsidy bonds were loaned, to be repaid only at the expiration of thirty years, with interest payable only at the expiration of that period. Even this was not enough. No association and no persons were found willing, with all this proffered assistance, to undertake the construction of the road. But so earnest was Congress to induce the corporators to attempt the work, that in 1864 additional aid was proffered, the grant of lands was doubled, and new privileges were conferred. We do not now

attempt to portray the earnestness — the all-absorbing earnestness — with which Congress sought to secure the construction of the road by private enterprise. It was well exhibited in *United States* v. *Union Pacific Railroad Co.* (91 U. S. 72), to which we refer. Suffice it to say, the purpose of Congress, above all others, was to obtain the construction of the railroad by the corporation it created to undertake the work. For that alone the subsidy bonds were given. Only for that the grants of land were made. All was intended to give the utmost possible assistance to the stupendous and unparalleled enterprise. We do not say that other incidental considerations were not kept in mind, but what we do assert as plainly manifest in the legislation is, that the paramount intention of Congress was to give such assistance to the company as to induce them to build the road. Every other consideration was subordinate to that.

All will concede that in construing the act of 1862 we are to look at the state of things then existing, and in the light then appearing seek for the purposes and objects of Congress in using the language it did. And we are to give such construction to that language, if possible, as will carry out the congressional intentions. For what particular purpose, then, was the grant of lands made? The statute itself answers, " for the purpose of aiding in the construction of the railroad and telegraph line," and securing governmental transportation, &c. The lands were granted to be used in furtherance of such construction. But Congress and the grantees must have known that, when granted, the lands were of little worth. They were then unsalable at any price. Their value was wholly prospective, dependent upon the construction of the road. Purchasers could not have been reasonably expected, certainly few, for immediate settlement. The obvious mode, therefore, of using the lands for the construction of the road (not for paying debts incurred in the construction, but for immediate need as the construction was progressing) was to hypothecate them as security for a loan. Many persons might be willing to advance money on the faith of the prospective value of the lands, if the railroad was built, who would not be willing to buy when it was doubtful whether the company would ever be able to raise the money necessary to build the road and thus render the lands salable. Congress must have

been blind, indeed, if it did not foresee this, and intend to authorize the use of the lands to raise money by mortgage for the object it had so much at heart. This, we think, was what was intended by the phrase " or disposed of," as distinguished from " sold." Some of the lands might be sold as the work was progressing, and others could be used in aid of the construction only by pledging them to persons who might be willing to advance money on the faith of their prospective value. But whether sold or used as a security for money loaned to advance the construction of the road, they were equally employed for the purpose for which they were granted. The words " disposed of " are undeniably apt words to indicate a transfer by mortgage. If land be conveyed to A. to enable him to raise money for a particular purpose, nobody would doubt that a mortgage would be a disposition of the land for that purpose; and the grant made by the third section of the act of 1862 was obviously made, as we have suggested, with the intent of giving present assistance to the company in the construction of the road. It was not intended to be available only after the company had raised all the money necessary for the work. Then the time of need for the purpose mentioned would have gone by. The act declares it to have been " to aid in the construction of the road," not to reimburse expenditures made in the construction. Hence it must have been intended that the company might use or dispose of the land in some other way than by a sale. But in what other way? Not by gift; for that would not have been in aid of the construction, and the grant was intended for that. Nor by leases. They could have brought little money. And no other mode of disposition except by mortgage has been suggested which could furnish the requisite aid for building the road. No other is conceivable. The conclusion would seem, therefore, to be almost inevitable, that Congress, when speaking of a disposition of the lands other than a sale, contemplated making them available for the purposes of the grant by mortgage.

And if so, it is hard to believe that only a limited interest in the lands was allowed to be hypothecated. Twelve years were designated as the period within which the road was required to be completed, and lands not sold or disposed of within three

years thereafter were to be open to pre-emption. Moreover, under the provisions of the act, the title to the lands could be perfected in the company only as the work of construction advanced; that is, as each section of forty miles was completed. The company might not become entitled to some until July 1, 1874. If, therefore, a mortgage could only bind the lands unsold until the expiration of three years after that date, it would have been an hypothecation for a term of years, and as to some of the lands, for a term of only three years. Was that the aid proffered by Congress to stimulate and render possible the completion of an enterprise in which it felt so deep an interest? If so, it was a barren gift. Looking at the character of the lands and their remoteness from settlements, it must have been evident enough that money could not have been raised on the credit of such a mortgage. The power of disposition given for the express purpose of enabling the company to raise money for the construction of the road, by such an interpretation of the act is made of no value. The interpretation, therefore, defeats the manifest intention of Congress, and for that reason it cannot be accepted.

If it be suggested, as it has been on behalf of the complainant, that the mortgage contains a provision that has some bearing upon the extent of its lien, it may be well here to notice that provision. The instrument purports to convey to the trustees a fee, and not a limited estate, and it requires in all sales that may be made under it the conveyance of a fee. It contains, however, the following clause: "It is hereby declared by the parties to this indenture that all the provisions of the said acts of Congress [referring to the acts of 1862 and 1864], so far as they are applicable, are hereby made and shall be deemed and taken to be a part of this instrument, and the said provisions in all that concerns the sale and disposal of the said lands hereby conveyed to the parties of the second part are to be observed and strictly and faithfully carried out and fulfilled."

What are thus stipulated to be observed and strictly and faithfully to be carried out and fulfilled are the provisions of the acts in all that concerns the sale and disposal of the lands. They are matters to be carried out and strictly fulfilled, — duties

to be performed by the company, and duties which concern the sale or disposal of the lands. Carrying out and performing a provision implies action, and the provision must, therefore, be one relating to action. But the acts of Congress contain no provision respecting the sale or disposal of the lands that requires action, that is, something to be carried out and fulfilled, except the implied duty of devoting the proceeds of sales or dispositions strictly and faithfully to aid in the construction of the road.

The provision that at the expiration of three years from the completion of the road the unsold or undisposed-of lands should be open to pre-emption, was in its nature not one to be "strictly and faithfully carried out and fulfilled" by the company. The right to pre-emption of whatever might be left for pre-emption was a matter with which the company had nothing to do, — in relation to which they had no duties to perform, and only a right to the price paid by the pre-emptor. The clause of the mortgage referred to seems, therefore, to have been intended only as a stipulation on the part of the company that whatever money was raised on the mortgage should be strictly and faithfully applied in furtherance of the purpose for which the grant of the lands was made ; namely, to aid in the construction of the railroad. Thus understod, it was a valuable stipulation for the mortgagees. It added to their security ; for the value of the lands depended principally upon the application by the company of all its means to the completion of the work.

On the other hand, if an hypothecation of the lands in fee was within the power to "dispose of" them, as we have endeavored to show, and if the granting part of the mortgage made, standing by itself, did hypothecate a fee, it is hard to believe the parties intended by the stipulations referred to to restrict the exercise of the power to the grant of an estate for years, a limitation alike injurious to the mortgagors and the mortgagees. We think, therefore, nothing in the stipulation is repugnant to the granting part of the mortgage which purported an hypothecation of the entire fee.

There is always a tendency to construe statutes in the light in which they appear when the construction is given. It is easy to be wise after we see the results of experience. We

may now think it quite possible the lands could all have been sold before July 1, 1877. The unforeseen success of the enterprise and the unprecedented rush of emigration along the line of the railroad have shed new light upon the value of the grants made to the company. But in endeavoring to ascertain what the Congress of 1862 intended, we must, as far as possible, place ourselves in the light that Congress enjoyed, look at things as they appeared to it, and discover its purpose from the language used in connection with the attending circumstances. Guided by this rule of construction, as well as by others universally recognized, we have been led unhesitatingly to the conclusion that the deed of trust or mortgage executed by this company in 1867 was a disposition of the lands granted by the third section of the act of 1862, within the meaning of that act.

We do not say that any mortgage, however small, or manifestly made to evade a *bona fide* execution of the purposes for which the grants were made, or made to defeat the policy of the government which encourages the sale of public lands to private settlers, and guards against the accumulation of large bodies in single hands, would be a disposal as understood by Congress. It may be conceded it would not be, for it would be in conflict with the avowed object of the grant. The present is no such case. By the pleadings it appears that the mortgage of 1867 was made "for the purpose of raising money necessary to continue and complete the construction of the railroad, in accordance with the act of Congress." Nor are we now called upon to decide whether the lands covered by the mortgage will not be open for pre-emption, if they shall remain unsold after the mortgage shall be extinguished. That question is not now before us.

The principal objection urged against the interpretation we have given to the words "sold or disposed of" is, that it is repugnant to the governmental policy of guarding against monopolies of public lands by large corporations or single individuals. It must be admitted that Congress had that policy in view when it declared that the lands not sold or disposed of within three years after the entire road should be completed should be subject to settlement and pre-emption, at a price not

exceeding $1.25 per acre. But this policy was manifestly sub-ordinated to the higher object of having the road constructed, and constructed with the aid of the land grant. No limitation was set to the quantity of land which the company might sell to single associations, or single persons. It was left at liberty to sell, if it could, to any land association or private purchaser, the entire body of the lands or any lesser quantity, regardless of the general legislative policy. It was allowed to sell or dispose of the grant at its pleasure, for the purpose of raising money to aid in the road construction, provided thus raising the money was done within the limited period. With that power no pre-emptor was authorized to interfere. Whatever contingent rights he had were postponed and subordinated to it. If, as we think it manifest, the leading primary policy of the act was to place the lands in the hands of the company, to be used for the completion of the road, as this work progressed, any secondary policy the government may also have had in view ought not to be allowed to embarrass or defeat that which was primary. It is evident Congress thought there might be remnants of the grant, not used in aid of the construction of the road, either because other resources of the company might prove sufficient, or because it might be found impossible to dispose of them in time to furnish such aid, and those remnants it undertook to open to settlement and pre-emption. This appears to us to have been what was intended, and all that was intended. The construction gives full effect alike to the paramount and the subordinate purposes of the act. Each has its own field of operation. The construction contended for by the appellant restricts the power of disposition, denies the authority of the company to utilize, except partially, for the purposes of the grant, the land granted, and might have impaired and possibly defeated the leading purpose of the grant. It subjects the paramount to the subordinate, and postpones the primary object to the secondary. On the other hand, utilizing the lands, by raising money upon them through a mortgage, or, in other words, disposing of them by mortgage, did not defeat the policy of opening the remnants not used to pre-emption.

Thus construing the last clause of the third section of the

act, in connection with all the other provisions made by Congress, endeavoring to give effect to every part, and regarding the spirit as well as the letter, we are constrained to hold that the mortgage of 1867 was a disposition of the lands mortgaged within the meaning of the statute, and, consequently, that the tract of land claimed by the complainant was not open to pre-emption when he undertook to pre-empt it. He has, therefore, no equitable title to it.

*Decree affirmed.*

MR. JUSTICE BRADLEY, with whom concurred MR. JUSTICE CLIFFORD and MR. JUSTICE MILLER, dissenting.

I dissent from the judgment of the court in this case. In the third section of the original charter, after granting to the company five alternate sections of public land on each side of its line of railroad, to aid in the construction thereof, it was provided that all lands so granted, which should not be sold or disposed of by the company within three years after the entire road should have been completed, should be subject to settlement and pre-emption, like other lands, at a price not exceeding $1.25 per acre, to be paid to the company. The appellant, after the three years had expired, settled upon the land in question and claimed pre-emption of the same; and offered to the company the price specified in the statute. The latter refused to receive the money or to recognize his right, alleging that it had disposed of the lands in 1867 by executing a mortgage for its entire land grant to secure a loan of $7,000,000. The question is, whether such mortgage is a sale or disposition of the lands within the meaning of the proviso of the third section. I think it is not. In my judgment, Congress had in view such a sale and disposition of the lands as would secure a settlement thereof. The object was to encourage a speedy settlement of the country along the line of the road; and hence it was provided, if the company did not so dispose of them, they should be open to settlers, at the usual prices, reserving to the company, however, the right to receive the purchase-money for the same. If the company, by one sweeping deed of trust, or mortgage, could cover the whole domain as with a blanket, and thus prevent a settlement thereon until

the lands, by advance of prices, would be out of the reach of actual settlers desirous of occupying and improving them, it seems to me it would entirely defeat the objects of the act.

It is said, however, that if the company could not mortgage the lands they could not make use of them in aid of the construction of the road, the purpose for which they were ex pressly granted. I do not think this result would by any means follow. The fourth section provides for granting to the company patents for a proportionate part of the lands, for every forty miles of railroad which should be completed. As fast, therefore, as the successive forty-mile sections should be completed, it was contemplated by the act that the company should have control of the lands to that extent. This would constantly subject to their use large tracts, which, if disposed of, according to the intent of Congress, would have effected a rapid settlement of the adjacent country in all portions of the route which were adapted to cultivation.

The criticism that the words "sold or disposed of" mean something more than "sold," and can only mean a mortgage of the lands, I do not conceive to be just, but rather as sticking in the bark. Reading the whole act together, I think the only fair construction is that which is above suggested.

The objection that the right of pre-emption contended for would have prevented the company from giving a mortgage at all is not tenable. The mortgagees take the mortgage subject to the provisions of the act. It contains a proviso to this ex- press effect. The lands were mortgaged *cum onere*, and the mortgagees, if so stipulated, would be entitled to the purchase- money receivable from settlers. This view of the subject would effectuate justice between all the parties, preserve the true construction of the act, and carry out the policy of Congress.

In view of these considerations, I think that the decree should be reversed, and that the appellant, the complainant below, should be declared to be equitably entitled to the land in question.