724 F.Supp. 398 (1989)
HOECHST AKTIENGESELLSCHAFT, Plaintiff,
v.
Donald J. QUIGG, Assistant Secretary of Commerce and Commissioner of the Patents & Trademarks, Defendant.
Civ. A. No. 89-763-A.
United States District Court, E.D. Virginia, Alexandria Division.
October 26, 1989.
*399 Tipton D. Jennings, Basil J. Lewris, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., for plaintiff.
Fred E. McKelvey, Sol., U.S. Patent and Trademark Office, Arlington, Va., Robert C. Erickson, Asst. U.S. Atty., Alexandria, Va., for defendant.

MEMORANDUM OPINION
ELLIS, District Judge.
This is a patent term extension case. It presents a novel question of statutory construction concerning Title II of the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Act"), 35 U.S.C. § 156.[1] Plaintiff, owner of a human drug patent, seeks extension of the patent term pursuant to the Act, claiming that the product covered by the patent underwent a lengthy FDA approval process prior to commercial use. Defendant, the Commissioner of the Patents & Trademarks (the "Commissioner"), denied the request on the ground that plaintiff's patented product had not been the subject of a "regulatory review period" as defined in the Act, specifically § 156(g), and was therefore ineligible for a term extension.
The matter is properly before the Court[2] on cross-motions for summary judgment as none of the material facts are disputed. While the Act's language is ambiguous, its structure and legislative history point ineluctably to the conclusion that plaintiff's patent does not fall within the universe of patents Congress intended to be eligible for term extensions. Given this, the Court concludes that summary judgment must be entered for the Commissioner.

Facts
Plaintiff owns United States Patent 3,737,433, the claims of which cover pentoxifylline, a pioneering drug useful in the treatment of vascular disorders. It is apparently the first of a new class of drugs known as hemorheologics and the first demonstrated to be effective for the treatment of intermittent claudification, a painful disorder associated with abnormal blood flow in the limbs. Plaintiff markets pentoxifylline as "TRENTAL", a registered trade name.
The TRENTAL patent was issued on June 5, 1973. Thereafter, plaintiff submitted a new human drug application to the Food and Drug Administration (FDA) for approval to market TRENTAL commercially. As is often the case with new drug applications, the process was lengthy.[3] FDA finally issued approval more than 10 years later on August 30, 1984. 60 Fed. Reg. 6052 (Feb. 13, 1985).[4] Congress passed the Act less than one month later, on September 24, 1984. Shortly thereafter, and within the 60 days allowed by § 156(d), plaintiff filed for a patent term extension under the Act. The Patent and Trademark Office (PTO) denied this request, concluding *400 that TRENTAL had not been subject to a "regulatory review period" within the meaning of the Act. The Commissioner subsequently denied plaintiff's request for reconsideration. In re Hoechst Aktiengesellschaft, 227 U.S.P.Q. 638 (Comm'r Pat. 1985).

Analysis
Analysis properly begins with a consideration of the Act's eligibility requirements for patent term extensions. These requirements appear in Section 156(a).[5] There is no dispute that plaintiff has satisfied all but one of this section's five requirements. Only the "regulatory review period" requirement of subsection (a)(4) is in dispute. Accordingly, the definition of the phrase "regulatory review period" is central. Various meanings of the phrase are given in Section 156(g) which has six subsections, each concerning a different type of drug or product. Subsection (g)(1) applies to human drugs such as TRENTAL. Subsections (g)(2)-(g)(5) apply, respectively, to food and color additives, medical devices, animal drugs, and veterinary biological products and are not directly relevant here. Subsection (g)(6), establishes certain caps or limitations on term extensions and applies to all five categories. Analysis here, therefore, focuses on subsections (g)(1) and (g)(6).
Subsection (g)(1)(A) states that
In the case of a product which is a new drug, antibiotic drug, or human biological product, the term means the period described in subparagraph (B) to which the limitation described in paragraph (6) applies.
Subsection (g)(1)(B) sets forth the formula for computing the length of the regulatory review period. In essence, the formula requires the summing of two time periods:
(1) the time period between requesting an exemption under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355 and the submission of a new drug application and
(2) the time period between the filing of a new drug application and its approval.
The parties do not dispute that this formula, when applied to TRENTAL, yields a period of 6.8 years. Instead, the dispute centers on how the "limitation described in paragraph (6) applies." 35 U.S.C. § 156(g)(1)(A). Paragraph (6) places caps on term extensions for three classes of patents:
(A) for patents issued after the Act's passage the term extension may not exceed five years;[6]
(B) for patents issued prior to the Act's passage and for which specified action under the FDA regulatory review process had not commenced by that time, the term extension may not exceed five years;[7]

*401 (C) for patents issued prior to the Act's passage and for which specified FDA review action had commenced but had not been completed by then, the term extension may not exceed two years.[8]
As it happens, TRENTAL falls outside all three classes[9] and therein lies the nub of this dispute.
The Commissioner contends that the three classes in paragraph (6) are integral to the statutory definition of "regulatory review period". And since the TRENTAL patent falls outside all three, it cannot meet the "regulatory review period" requirement of Section 156(a) and is therefore ineligible for a term extension. In support, the Commissioner argues that this result is compelled by the statute's language, whereas the opposite result would impermissibly read out of the statute and render superfluous the language "to which the limitation described in paragraph (6) applies." 35 U.S.C. § 156(g)(1)(A).[10]
Plaintiff's contention, on the other hand, is that paragraph (6) is not part and parcel of the definition of "regulatory review period," but only provides limitations that apply in the three specific classes of patents delineated there. For patents outside these three classes, the "regulatory review period" is defined or measured by the formula in § 156(g)(1)(B). Plaintiff, like the Commissioner, argues that the plain meaning of the statute compels the result it seeks. Specifically, plaintiff relies on the language in paragraph (6) stating that "[a] a period determined under any of the preceding paragraphs [including (1)(B) pertaining to human drugs] is subject to the following limitations." According to plaintiff, a plain reading of this language presumes the existence of a regulatory review period that has already been determined, in this instance, pursuant to (1)(B). This analysis, plaintiff contends, clearly shows that paragraph (6) is not definitional; it merely sets caps on term extensions for some, but not all classes of patents that may be eligible for a term extension.
Both positions based on the statutory language are plausible; neither is ultimately convincing. There is sufficient ambiguity in that language to accommodate and bear the weight of both positions. To choose between these competing positions the Court must answer the central question whether Congress intended the universe of eligible patents to be those defined in paragraph (6) or those that meet the application criteria of Section 156(d). As noted, the three classes of paragraph (6) reduce essentially to all unexpired patents issued after the Act's passage and those issued prior to the Act's passage, but which do not receive FDA approval until after that date. Paragraph (6) does not apply to the TRENTAL patent because it received FDA approval less than a month prior to the Act's *402 passage. But the TRENTAL patent extension request satisfied all the remaining criteria of Section 156, including that of Section 156(d) which required that the term extension be filed within 60 days of FDA approval for the product. Put another way, therefore, the central question presented is whether Congress intended the entire universe of patents eligible for term extension to be subject to a cap on that extension of five or two years as set forth in paragraph (6) or, whether it intended for many, but not all, to be so capped and for the remainder, i.e., those that received FDA approval shortly before the Act's passage, to receive whatever term extension results from the application of the subsection (g)(1)(B) formula. The answer to this question must be sought in the Act's structure and legislative history.
The Act's legislative history is extensive. In general, it records Congress' recognition that the protracted FDA approval process often unfairly reduces a drug patent's effective life.[11] This occurs, as a House Report noted, "because patents are often obtained before products are ready to be marketed."[12] As a remedy, Congress chose, through the Act, to permit certain patents to be extended in specific circumstances. Significantly for the issue at bar, the focus of the Act was intended to be narrow, a reflection that it represented a hard-fought compromise between the generic drug industry and the research intensive pharmaceutical firms.[13] There was recognition, accordingly, that not all new drug product patents would be covered.[14] Even more significant, and indeed dispositive on the issue at bar, is that the legislative history is replete with evidence that Congress did not intend to allow the term of any patent to be extended by more than five years.
Thus, according to the various House Reports:
[The Act] places several limits on the period of patent extension. First, the period of extension may not exceed two years for products either currently being tested or awaiting approval. For all other products, the period of extension may not exceed five years.

House Report I at 15, reprinted in 1984 U.S.Code Cong. & Admin.News at 2648 (emphasis added).
In general, the bill provides that a patent may be extended for a period of up to five years if the patented drug (or other item subject to regulatory review by the FDA) has undergone regulatory review. The bill provides several general rules for calculating the period of the extension. First, only one-half of the testing phase may be counted. Second, a year-for-year matching extension is available for any time in the drug approval process that the drug spends awaiting a decision by the FDA. The five year rule is available to all drugs which have not yet undergone testing by the FDA. With respect to drugs which have been patented and tested but not yet approved by the FDA, the maximum period of extension is two years.

H.R.Rep. No. 857, 98th Cong., 2d Sess., Part II, at 6 (1984), reprinted in 1984 U.S.Code Cong. & Admin.News 2686, 2690 (hereinafter "House Report II") (emphasis added).
The Committee established different maximum periods of extension to provide greater incentive for future innovations. By extending patents for up to five years for products developed in the future, and by providing for up to fourteen years of market exclusivity, the Committee expects that research intensive *403 companies will have the necessary incentive to increase their research and development activities.
House Report I at 41, reprinted in 1984 U.S.Code Cong. & Admin.News at 2674 (emphasis added). This abundant legislative history[15] shows convincingly that Congress intended that a cap on term extensions apply to all patents covered by the Act.
The Act's general structure is consistent with this express legislative intent. Specifically, the structure of Subsection 156(g)(6) makes the length of a patent term extension depend upon where the patented product is along the development continuum from conception to commercial use. Thus, the longest term extension of five years is reserved for products furthest from commercial use, i.e., products either not yet patented at the time of the Act's passage or products patented then but not yet having commenced the regulatory review process. The shorter two year extension is reserved for those patented products for which the regulatory review process had already commenced at the time of the Act's passage, i.e., those closer to commercial use. To be sure, this statutory structure making the length of the term extension depend upon proximity to commercial use fails, inexplicably, to mention the precise class of patents to which TRENTAL belongs. Still, the structure points persuasively and ineluctably to the conclusion that TRENTAL is entitled to no patent extension because, at the time of the Act's passage, it had already reached the point of approval and commercial use. Surely it would be anomalous and contrary to the legislative purpose[16] to extend the TRENTAL patent for 6.8 years, as plaintiff requests, when a product not yet patented or even conceived is entitled to no more than five years. Even a two year extension is inappropriate given that TRENTAL, in contrast to the patented products entitled to a two year extension, had already won approval by the time of the Act's passage. Nor is there any persuasive reason in principle for this Court to exercise its equitable power (even assuming, arguendo, that such power exists)[17] to extend the TRENTAL patent two or five years. One might as well ask this Court to extend the terms of already expired patents which underwent fifteen or twenty year regulatory review periods in the 1960's and 1970's. That those patents cannot be extended may be viewed by some as inequitable,[18] but the line Congress chose to draw excludes those patents. Here, too, the TRENTAL patent falls on the wrong side of this line and is *404 therefore entitled to no term extension.[19]
An appropriate order will issue.
NOTES
[1] Pub.L. 98-417, 98 Stat. 1585 (1984) as amended by the Generic Animal Drug & Patent Term Restoration Act, Pub.L. 100-670, 102 Stat. 3971 (1988). Though the Act is codified as amended at 35 U.S.C. § 156, the parties agree that the 1988 amendments are irrelevant to this case.
[2] Jurisdiction and venue are not contested. As this action arises under the patent laws, subject matter jurisdiction plainly exists. 28 U.S.C. §§ 1338(a), 1361; Dubost v. U.S. Patent & Trademark Office, 777 F.2d 1561, 1564-65 (Fed.Cir. 1985); Wyden v. Commissioner, 807 F.2d 934 (Fed.Cir.1986) (en banc). Venue is proper in this district as the Commissioner is present here. See 28 U.S.C. § 1391(e).
[3] Plaintiff claims that the FDA regulatory review process for TRENTAL consumed 9.5 years and that development costs relating to TRENTAL from 1970 until FDA approval were approximately 9.8 million dollars. Total research and development costs, according to plaintiff, were about 20.8 million dollars. These and other facts in plaintiff's papers drew the Commissioner's objection as being outside the administrative record. See 35 U.S.C. 156(e)(1); see also Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); Fisons plc v. Quigg, 876 F.2d 99, 10 USPQ 2d 1869 (Fed.Cir.1989). Because the facts objected to are not material to the question presented, it is unnecessary to resolve this objection.
[4] TRENTAL was first commercially used or marketed on September 17, 1984.
[5] Section 156(a) states, in pertinent part, as follows:

(a) The term of a patent which claims a product, a method of using a product, or a method of manufacturing a product shall be extended in accordance with this section from the original expiration date of the patent if 
(1) the term of the patent has not expired before an application is submitted under subsection (d) for its extension;
(2) the term of the patent has never been extended;
(3) an application for extension is submitted by the owner of record of the patent or its agent and in accordance with the requirements of subsection (d);
(4) the product has been subject to a regulatory review period before its commercial marketing or use;
(5)(A) ... the permission for the commercial marketing or use of the product after such regulatory review period is the first permitted commercial marketing or use of the product under the provision of law under which such regulatory review period occurred;
. . . . .
The product referred to in paragraphs (4) and (5) is hereinafter in this section referred to as the "approved product".
[6] Subsection (g)(6)(A) provides:

If the patent involved was issued after the date of the enactment of this section, the period of extension determined on the basis of the regulatory review period determined under any such paragraph may not exceed five years.
[7] Subsection (g)(6)(B) provides in pertinent part:

If the patent involved was issued before the date of the enactment of this section and 
(i) no request for an exemption described in paragraph (1)(B) ... was submitted,
. . . . .
before such date for the approved product the period of extension determined on the basis of the regulatory review period determined under any such paragraph may not exceed five years.
[8] Subsection (g)(6)(C) provides in pertinent part:

(C) If the patent involved was issued before the date of the enactment of this section and if an action described in subparagraph (B) was taken before the date of the enactment of this section with respect to the approved product and the commercial marketing or use of the product has not been approved before such date, the period of extension determined on the basis of the regulatory review period determined under such paragraph may not exceed two years....
[9] The TRENTAL patent issued prior to the passage of the Act, but FDA approval had also occurred prior to that date. Hence, TRENTAL falls outside 6(A), (B) and (C).
[10] For this proposition, the Commissioner relies on well-settled authority that courts should give effect to all portions of a statute and avoid constructions that render any language superfluous. See, e.g., NLRB v. Lion Oil Co., 352 U.S. 282, 288-290, 77 S.Ct. 330, 333-34, 1 L.Ed.2d 331 (1957) (each part or section of a statute should be construed in connection with every other part or section so as to produce a harmonious whole); Montclair v. Ramsdell, 107 U.S. 147, 152, 2 S.Ct. 391, 395, 27 L.Ed. 431 (1882) (court's duty, if possible, is to give effect to every clause and word of a statute); Platt v. Union Pacific R.R., 99 U.S. 48, 58, 25 L.Ed. 424 (1878) (legislature is presumed to have used no superfluous words).
[11] H.R.Rep. No. 857, 98th Cong., 2d Sess., pt. I, at 17, reprinted in 1984 U.S.Code Cong. & Admin.News 2647, 2650 (hereinafter "House Report I"); see also S.Rep. No. 138, 97th Cong., 1st Sess. 2 (1981).
[12] Id.
[13] See Innovation and Patent Law Reform: Hearings on H.R. 3285, H.R. 3286 and H.R. 3605 Before the Subcomm. on Courts, Civil Liberties and the Administration of Justice of the House of Representatives Comm. on the Judiciary, 98th Cong., 2d Sess. 405 (1984) (testimony of Robert J. Lewis representing the Pharmaceutical Manufacturing Assoc.); see also Glaxo Operations UK Ltd. v. Quigg, 706 F.Supp. 1224 (E.D.Va.1989).
[14] Id. at 425.
[15] Worth noting is the rise of a new "textualist" school of statutory construction, championed by Justice Scalia, which rejects the use of extra-statutory materials such as legislative history materials. See Green v. Bock Laundry Mach. Co., ___ U.S. ___, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989). Whatever the merits of this view in other contexts, it seems inapposite where, as here, the legislative history is abundant, unequivocal, and uniform in view.
[16] The Act's basic purpose was to provide the stimulus for innovation that a patent's guarantee of market exclusivity provides and that is necessary to encourage the research and development of new drugs. See House Report I at 15, 17-18, reprinted in U.S.Code Cong. & Admin. News at 2648, 2650-51; House Report II at 5-6, reprinted in U.S.Code Cong. & Admin.News at 2689-90.
[17] No apposite or convincing authority has been cited to the Court for the proposition that federal courts have inherent power to extend patent terms. Plaintiff relies on A.F. Stoddard & Co. v. Dann, 564 F.2d 556 (D.C.Cir.1977) for the premise that federal courts "may on rare occasions ... delve within the interstices of a statute to do justice." Id. at 566. The facts of Dann, however, involved a simple application of the well settled rule of construction that plural words include the singular. This modest exercise in construction is hardly equivalent or analogous to the action plaintiff requests here. Dann involved a small step in a direction guided by settled authority. Plaintiff's request in the case at bar involves a large leap in a direction unguided by precedent and contrary to the Congressional scheme.
[18] Significant in this respect is that the total number of patented drug products in TRENTAL's class is quite small. In the sixty days before the Act's passage, the FDA approved approximately thirty two New Drug Applications. Of this number, only four filed for patent term extensions. The Commissioner denied patent term extensions in each of these four cases. See, e.g., In re Hoechst Aktiengesellschaft, 227 U.S.P.Q. 638 (Comm'r Pat.1985).
[19] This Court's decision in Glaxo Operations U.K. Ltd. v. Quigg, 706 F.Supp 1224 (E.D.Va. 1989), is not to the contrary. There, the Court declined to ignore the plain meaning of the Act in favor of the Commissioner's strained reading of the legislative history. Here, by contrast, the plain meaning of the Act is not dispositive but the pertinent legislative history is clear and uniform.