POWERS *v.* CITY OF TROY.

DECISION OF THE COURT.

1. DEATH—SUMMARY JUDGMENT—STILLBORN CHILD.
   Summary judgment for defendants in action under death act
   by administratrix of the estate of one who was negligently
   injured *en ventre sa mere* and subsequently stillborn is af-
   firmed (CL 1948, § 691.581 *et seq.*).

SEPARATE OPINION.
DETHMERS, C. J., and KELLY, O'HARA, and ADAMS, JJ.

2. DEATH—SUMMARY JUDGMENT—STILLBORN CHILD.
   *Summary judgment for defendants in action under death act*
   *by administratrix of the estate of one who was negligently*
   *injured* en ventre sa mere *and subsequently stillborn* held,
   *proper, since such a being is not a person within the meaning*
   *of the wrongful death act (CL 1948, § 691.581 et seq.).*

REFERENCES FOR POINTS IN HEADNOTES
[1] 5 Am Jur 2d, Appeal and Error § 853; 41 Am Jur, Pleading
    §§ 340–343.
[2, 3, 9, 12, 13] Prenatal injury as ground of action.  27 ALR2d
    1256.
[4] 30 Am Jur, Intoxicating Liquors § 525 *et seq.*
[5, 11] 22 Am Jur 2d, Death § 2 *et seq.*
[6, 7] 50 Am Jur, Statutes § 488 *et seq.*
[8] 50 Am Jur, Statutes § 502 *et seq.*
[10] 22 Am Jur 2d, Death § 1.
[14–18] 22 Am Jur 2d, Death § 123.
[19] 22 Am Jur 2d, Death §§ 123, 218, 249, 250.
[20–24, 27–32, 35] Prenatal injury as ground of action.  27 ALR2d
    1256.
[23, 24] 22 Am Jur 2d, Death §§ 121, 123, 135, 211.
[25] 16 Am Jur 2d, Constitutional Law § 101 *et seq.*
[26] 22 Am Jur 2d, Death § 22 *et seq.*
[33, 36] 58 Am Jur, Workmen's Compensation § 170 *et seq.*
[34] 1 Am Jur 2d, Abortion § 1 *et seq.*
[37] 50 Am Jur, Statutes § 217 *et seq.*
[38, 39] 22 Am Jur 2d, Death §§ 12–17.
[40] 22 Am Jur 2d, Death § 6.

3. SAME—FETAL CHILD—ABORTION.

*Court, in death act case, does not consider the theological or philosophical status of a fetal child in the context of laws relating to abortion (CL 1948, § 691.581 et seq.).*

4. INTOXICATING LIQUORS—DRAMSHOP ACT.

*Loss of support is the essence of the action under the dramshop act (CLS 1956, § 436.22).*

5. DEATH—WRONGFUL DEATH.

*Wrongful death of a person is the* sine qua non *under the death act (CL 1948, § 691.581 et seq.).*

6. SAME—LEGISLATURE—PERSON.

*"Person," as used in the wrongful death act, was used in its ordinary, generally accepted meaning at the time of the enactment (PA 1848, No 38).*

7. STATUTES—CONSTRUCTION AS OF TIME OF ENACTMENT.

*The construction of a statute must be made in the light of circumstances existing at the date of its enactment, not in the light of subsequent developments.*

8. SAME—WORDS AND PHRASES.

*Words of a statute are to be taken in their ordinary signification and import.*

9. DEATH—PERSON—FETAL CHILD.

*The word "person," in its ordinary signification in 1848 when the wrongful death act was enacted, did not include the concept of a fetal child (PA 1848, No 38).*

10. SAME—COMMON LAW.

*Cause of action for wrongful death did not exist at common law.*

11. SAME—STATUTES—COMMON LAW.

*The wrongful death act is a statute in derogation of the common law (CL 1948, § 691.851 et seq.).*

SEPARATE OPINION.

BRENNAN, J.

12. DEATH—DAMAGES—PLEADING—SPECULATION.

*Complaint in action under the wrongful death act which alleged that the parents of plaintiff's decedent, a stillborn infant claimed to have been injured while* en ventre sa mere, *had been deprived of possible and probable monetary contributions*

*of the child, and of the child's services which would have been rendered to them in their old age* held, *pure speculation in the absence of some specific and unusual circumstances of dependency on the part of the parents (CL 1948, § 691.581 et seq.).*

13. SAME—DAMAGES—MUTUAL SOCIETY AND COMPANIONSHIP OF CHILD.

> *Damages for deprivation of the mutual society and companionship of a child, as alleged in complaint filed under the wrongful death act by administratrix of estate of stillborn child, claimed to have been injured while* en ventre sa mere, held, *not to have thereby claimed a pecuniary loss (CL 1948, § 691-.581 et seq.).*

14. WORDS AND PHRASES—PECUNIARY.

> *The word* pecuniary *means consisting in money, exacted or given in money.*

15. SAME—PECUNIARY—ADJECTIVES—NOUNS.

> *The word* pecuniary *is an adjective and since it is the function of an adjective to modify a noun, a noun so modified no longer has the universal meaning it had when not so modified.*

16. DEATH—PECUNIARY INJURY.

> *A* pecuniary injury, *as the term is used in the wrongful death act, is an injury that is measured in money (CL 1948, § 691-.581 et seq.).*

17. DAMAGES—PECUNIARY INJURY.

> *The thing that distinguishes a pecuniary loss or injury from a nonpecuniary loss or injury is the nature of the injury itself as it is regarded by persons who suffer such injuries generally.*

18. DEATH—PECUNIARY INJURY—COMPANIONSHIP.

> *Companionship of persons is not a commodity generally bought and sold by citizens of this State; hence, the loss of it should not be considered as a pecuniary injury or loss under the death act (CL 1948, § 691.581 et seq.).*

19. EVIDENCE—JUDICIAL NOTICE—PECUNIARY LOSS—HUMAN LIFE.

> *Judicial notice is taken that people do not measure human life in terms of money, nor regard loss of human life as a mere pecuniary loss.*

SEPARATE OPINION.

SOURIS, J.

20. NEGLIGENCE—PRENATAL INJURIES.

*The right of a child born alive to recover damages for negligently inflicted prenatal injuries, has not yet been recognized in this State.*

21. DEATH—DEATH ACT—NEGLIGENCE—PRENATAL INJURIES—STILLBIRTH.

*Holding that a stillborn child's administratrix can sue under the wrongful death act for damages for negligently inflicted prenatal injuries which cause the stillbirth, is premature (CL 1948, § 691.581 et seq.).*

22. INFANTS—FETUS EN VENTRE SA MERE—STILLBIRTH.

*Courts have not hesitated to consider* in esse *a fetus* en ventre sa mere *whenever to do so would be beneficial to the child born alive, but when a stillbirth results there is no live child for whose benefit the courts can act.*

23. DAMAGES—TORTS—LOSS OF COMPANIONSHIP OF STILLBORN CHILD.

*The court has not yet held that parents may recover damages for loss of the companionship of their stillborn child, in common-law tort actions, but the trend of case law points the way toward the future development of a more realistic measure of damages recoverable by the parents, and this development is preferable to adding to the law the fiction that the wrongful death act provides a remedy for the benefit of a stillborn child (CL 1948, § 691.581 et seq.).*

SEPARATE OPINION.

BLACK, J.

24. DAMAGES—LOSS OF COMPANIONSHIP—PROBATE CODE—WRONGFUL DEATH ACT.

*The interconnected probate code and wrongful death acts have been amended by judicial decision to provide damages for loss of companionship and distribution of such damages to survivors who in no alleged or actual sense were persons who were dependents of the decedent (CL 1948, §§ 691.581, 691.582, 702.115).*

25. JUDGES—STATUTE—AMENDMENT—CONSTITUTIONAL LAW.

*Judges violate the law when they vote to amend a statute they dare not pronounce unconstitutional.*

26. Death—Wrongful Death—Action.

    *A cause of action for wrongful death comes into being only when the claimed death occurred (CL 1948, §§ 691.581, 691.582).*

27. Same—Summary Judgment—Decedent—Dependent.

    *Summary judgment for defendants in action under death act by administratrix of the estate of one who was negligently injured en ventre sa mere and subsequently stillborn held, proper, since plaintiff's cause for recovery and distribution of "pecuniary" damages never arose, because there was no "decedent" and no "dependent" within the meaning of unitary statutes, an amendment of the death act and a section of the probate code (CL 1948, § 691.581 et seq., § 702.115).*

28. Statutes—Fetus—Person.

    *A fetus cannot be deemed a "person" or a "decedent" within our interconnected probate code and wrongful death act (CL 1948, §§ 691.581, 691.582, 702.115).*

DISSENTING OPINION.

T. M. Kavanagh, J.

29. Death—Wrongful Death Act—Person.

    *A 6-month-old fetus is a* person *within the meaning of the wrongful act (CL 1948, § 691.581 et seq.).*

30. Infants—Unborn Child—Dramshop Act.

    *An unborn child is a person entitled to bring an action under the Michigan dramshop act (CLS 1961, § 436.22).*

31. Same—Child En Ventre Sa Mere—Construction.

    *A child* en ventre sa mere, *for all purposes of construction, is considered as a child* in esse *if it would be for the child's benefit to be so considered.* ·

32. Same—Posthumous Children—Injury While En Ventre Sa Mere.

    *Posthumous children are considered as living at the death of their parents, and such children may sue for injury or loss sustained while* en ventre sa mere.

33. Same—Workmen's Compensation—Death of Parent.

    *Posthumous children, under workmen's compensation statutes, are entitled to compensation due as the result of the death of a parent.*

34. SAME—CHILD EN VENTRE SA MERE—CRIMINAL LAW—ABORTION.
   *A child's legal existence* en ventre sa mere *has long been recognized in abortion and other criminal statutes.*

35. SAME—EVIDENCE—CHILD IN WOMB.
   *The difficulty of proof of proximate cause of injury to a child in the mother's womb is no reason to deny recovery in a proceeding to recover damages.*

36. STATUTES — WORKMEN'S COMPENSATION — CRIMINAL LAW — PERSON.
   *The term "person" is to be accorded its ordinary signification when legislatively employed and given the same construction the Michigan Supreme Court has given it in workmen's compensation cases, criminal law, and abortion cases, descent and distribution of property cases, and civil damage cases, including the dramshop statute, that is, to include a fetus from the time of conception.*

37. SAME—LANGUAGE—CONSTRUCTION.
   *Identical language should receive identical construction when found in different sections of the same statute.*

38. DEATH—PURPOSE OF WRONGFUL DEATH ACT.
   *The death act accords a right of action for damages notwithstanding the death of the person injured, and makes no distinction as to time of death whether before or after birth (CL 1948, § 691.581 et seq.).*

39. SAME—PURPOSE OF DEATH ACT—TORTS.
   *The prime purpose of the death act was to put an end to the common-law rule that tort-feasors whose acts killed rather than injured their victims would escape liability (CL 1948, § 691.581 et seq.).*

40. SAME—DEATH ACT—CONSTRUCTION.
   *The death act was designed to permit recovery even after death and a strained construction of the act should not be adopted to defeat its purpose (CL 1948, § 691.581 et seq.).*

Appeal from Court of Appeals, Division 2, Lesinski, C. J., T. G. Kavanagh and Quinn, JJ., affirming Oakland, Ziem (Frederick C.), J. Submitted October 4, 1967. (Calendar No. 7, Docket No. 51,637.) Decided March 4, 1968.

4 Mich App 572, affirmed.

Complaint by Hazel L. Powers, administratrix of estate of Baby Boy Powers, deceased, against City of Troy, a Michigan corporation, and Alex Ventittelli for damages under the wrongful death act. Plaintiff claimed decedent was injured *en ventre sa mere* when the mother was injured in an automobile collision caused by defendant Ventittelli, and later was stillborn. Defendants' motion for summary judgment was granted. Judgment affirmed by Court of Appeals. Plaintiff appeals. Affirmed.

*Cicinelli, Mossner, Majoros, Harrigan & Alexander,* for plaintiff.

*Patterson & Patterson, Barrett, Whitfield, Manikoff and White (Robert G. Waddell,* of counsel), for defendants.

O'HARA, J. *(for affirmance).* This case involves an interpretation of the Michigan wrongful death act.[1] Specifically, the question is the meaning of the word "person" in the first sentence of the statute:

"Whenever the death of a *person* or injuries resulting in death, shall be caused by wrongful act * * * then and in every such case, the person who, or the corporation which would have been liable, if death had not ensued, shall be liable to an action for damages." (Emphasis supplied.)

In this case the *person* said to be involved was a 6-month-old male child *en ventre sa mere*. The child was stillborn. The question of the wrongful act as the proximate cause of the stillbirth is not in issue. The sole question posed by appellant and accepted by appellee is:

---

[1] CLS 1948, § 691.581 *et seq.* (Stat Ann 1959 Cum Supp § 27.711 *et seq.*). See, currently, CLS 1961, § 600.2922, as amended by PA 1965, No 146 (Stat Ann 1968 Cum Supp § 27A.2922).

"Is an unborn child which is negligently injured by defendant and subsequently stillborn a 'person' within the meaning of Michigan's wrongful death act?"

We make clear at the outset that we are not here considering the theological, nor philosophical status of a fetal child in the context of laws relating to abortion. We confine ourselves strictly to the meaning of a "person" within the wrongful death act. The assigned Justice, and any Justice signatory hereto, expressly limit the views they here express to the interpretation of the statute which is the subject of judicial construction.

The probate court for Oakland county appointed an administratrix for the estate of the stillborn child. By that administratrix a suit was started in the circuit court for the same county under the wrongful death act. Defendant prior to answer moved for summary judgment. The trial judge held:

"A viable baby boy in its sixth month of gestation which is negligently injured by a defendant and subsequently stillborn is not a 'person' within the meaning of Michigan's wrongful death act."

The Court of Appeals affirmed. Its holding was:

"Therefore, while we find authority for the proposition of appellant, we are bound by the holding in *Newman*,[2] *supra*, the intent of the legislature under the Michigan wrongful death act, and the clear meaning of the term 'person' as used therein." 4 Mich App 572, 577.

We granted leave. Appellant urges 2 principal arguments. First, it is claimed that *Newman* was by implication, if not explicitly, overruled by *LaBlue* v. *Specker* (1960), 358 Mich 558. Second, if *Newman* has not been overruled by *LaBlue,* we should do so

---

[2] *Newman* v. *City of Detroit* (1937), 281 Mich 60.

now. In support of the second argument appellant contends that the *ratio decidendi* of *Newman* is no longer valid. *Newman*, it is argued, was based upon the "overwhelming weight of authority" concept, while in the interim, since 1937, many jurisdictions have changed positions. In further support of the second argument, appellant relies on the "enlightened view" concept as part of the "no wrong without a remedy" proposition.[3]

Appellee, *per contra*, premises his argument on the traditional view that to hold a fetal child under our death act to be a "person" we, in legal effect, judicially amend a statute which has been construed since its enactment over a hundred years ago to exclude the cause of action contended for by appellant. The argument is advanced that the construction asked by appellant is no part of a growth of the common law so vital to its continuing efficacy, but rather that our death act is a lineal descendant of Lord Campbell's act and is in derogation of the common law, that it is the statute which gives the cause of action, and that the courts are not privileged to create a new cause of action under the guise of liberal interpretation. Additional argument is made to the point that authorities not only divide on the issue here presented, but subdivide on the difference between the right of a viable fetus negligently injured during gestation but born alive, and one stillborn.

We address ourselves first to the contention that *LaBlue, supra,* overruled *Newman*. We do not so read *LaBlue*. First, *LaBlue* was not an action asserted under the wrongful death act. The action was based on the so-called "dramshop" act[4] by reason of an alleged illegal sale of liquor to a minor. That

---

3 A suit in Oakland county brought by the parents of the stillborn child as distinguished from the suit by the mother as an administratrix impends in the Oakland county circuit court.

4 CLS 1956, § 436.22 (Stat Ann 1957 Rev § 18.993).

minor, prior to his death, had allegedly acknowledged he was the father of a child to be born to an unwed female to whom he was engaged. Conception was alleged to have taken place in June of 1956. The minor father was killed on August 19, 1956. The declaration of paternity must then have been made between those 2 dates. The child was born on March 8, 1957. It was plaintiff's theory that the child lost the support of the self-declared and betrothed father. No injury to the mother during pregnancy occurred. The fetal child in the period of gestation was not injured in the sense of the injury to the fetal child in this case. *LaBlue* is closer to the family of cases recognizing a posthumous child as a dependent for inheritance purposes. Under the dramshop act loss of support is the essence of the action. Under the death act it is a wrongful death of a person which is the *sine qua non*. We reject the contention that *LaBlue* overruled *Newman* either expressly or by implication.

Next, we consider the "public policy" argument. We do not express ourselves upon it, nor upon the "majority view" argument. Neither do wo distinguish between assertibility of a cause of action based on injury to a child *in utero* which has survived birth and later dies and one which is stillborn. Rather we rest our decision squarely upon the fact that at the time our wrongful death act was passed the legislature used the term "person" in its ordinary, generally accepted meaning at that time. Such has been and remains a cardinal principle of statutory construction to ascertain legislative intent:

"In construing a statute, we are to construe it in the light of the circumstances existing at the date of its enactment, not in the light of subsequent developments." *Wayne County Board of Road Commissioners* v. *Wayne County Clerk*, 293 Mich 229, 235.

See, also, 25 RCL, Statutes, § 215, p 959, which in turn was fortified by *Platt* v. *Union P. R. Co.* (1879), 99 US 48 (25 L ed 424); 50 Am Jur, Statutes, § 236, p 224.

This has been the uniform policy of this Court beginning with *Green* v. *Graves* (1844), 1 Doug (Mich) 351, where the Court said at p 354:

"The words of a statute are to be taken in their ordinary signification and import."

We are not convinced that "person" in its ordinary signification in 1848 when our death act was passed included the concept of a fetal child. It should be noted and emphasized that we deal here, not with a cause of action which existed at common law. We do not face here the question of broadening the base of recovery in an action already recognized at common law. We deal with a statute in derogation of the common law.

We are constrained to agree with the reasoning of the supreme court of Tennessee in *Hogan* v. *McDaniel* (1958), 204 Tenn 235 (319 SW2d 221). In considering the same question, under a statute substantially the same as ours, the Court said (pp 244, 245):

"There is no ambiguity in our wrongful death statute. We must consider it as it is written, not as we would have it. Only the legislature has authority to create legal rights and interests. It results that no right of action, such as plaintiffs seek to assert, can be brought until there is legislative authority for it."

Considering the plain import of the word "person" at the time of enactment of our statute and its uniform interpretation through the years, we feel obligated to accord to the term its "ordinary signification" when legislatively employed.

The order of the Court of Appeals affirming the entry of summary judgment for defendants is affirmed. Costs to the defendants.

DETHMERS, C. J., and KELLY and ADAMS, JJ., concurred with O'HARA, J.

BRENNAN, J. (*for affirmance*). This case of Powers is the *reductio ad absurdum* of *Wycko* v. *Gnodtke* (1960), 361 Mich 331. Having erroneously ruled in *Wycko* that a human being, like a horse or a mule, has a value to be measured in greenback dollars, this Court is now confronted with an extreme case of a very short-lived human being. As in most cases, when an erroneous premise is reduced to its most absurd extreme, our Court would now avoid confessing the error of *Wycko* by changing the subject.

We would now compound our error by holding against the great weight of American jurisprudential authority that a prenatal injury is no injury at all because the plaintiff didn't exist at the time it happened. By such illogical reasoning, we will some day say to a man, horribly scarred or deformed through the malpractice of the obstetrician who delivered him into the light of day, that the scar on his forehead is, by the cruelest legal fiction, an injury to his mother.

In an effort to avoid facing up to our recent errors in *Wycko*, *Currie*[1], *Heider*[2], *Reisig*[3], we flirt with branding the unreasoned opinion in *Newman* v. *City of Detroit*[4] as an established and binding precedent,

---

1 *Currie* v. *Fiting* (1965), 375 Mich 440.
2 *Heider* v. *Michigan Sugar Company* (1965), 375 Mich 490.
3 *Reisig* v. *Klusendorf* (1965), 375 Mich 519.
4 *Newman* v. *City of Detroit* (1937), 281 Mich 60.

while at the same time overruling the well-reasoned opinion in *Tunnicliffe* v. *Railway Co.*[5]

*Newman* v. *City of Detroit* held, without much explanation, that there is no action at common law or by statute for the recovery of damages for prenatal injuries. *Newman* is bad law and some day should be overruled. But the overruling should come in a proper case, either brought by a living plaintiff who alleges an injury to him while he was yet in his mother's womb or brought by the personal representative of a decedent, whose death was caused by the prenatal injury, and on account of whose death actual pecuniary losses can be shown. This instant case of Powers is not such a case.

In this case of Powers, the complaint alleges in paragraph 22, by way of damages, "the parents of said child have been deprived of the possible and probable monetary contributions of said child; that they likewise have been deprived of the services of said child, particularly services which would have been rendered to them in their old age; that further, they have been deprived of the mutual society and companionship of said child during their respective lifetimes." Judged as pecuniary loss had always been judged prior to *Wycko*, these allegations do not state a cause of action under the death act. Monetary contributions of a minor child in these times are not to be presumed, and neither are services to be rendered to parents in their old age. In the absence of some specific and unusual circumstances of dependency on the part of the parents, combined perhaps with their inability to have other children, if such were the fact, damages for such items in the case of an infant decedent, are purest speculation. The complaint further claims damages

---

[5] *Tunnicliffe* v. *Bay Cities Consolidated R. Co.* (1894), 102 Mich 624.

for deprivation of the mutual society and companionship of the child. In a humane and civilized culture, such a thing is not a pecuniary loss.

The word *pecuniary* means *consisting in money; exacted or given in money.* The word pecuniary is an adjective. It is the function of an adjective to modify a noun. When so modified, the noun no longer has the universal meaning which it has when it is not so modified. Thus a pecuniary injury is to be distinguished from a nonpecuniary injury. A pecuniary injury is one that *is* measured in money. A nonpecuniary injury is one that *is not* measured in money. The question is not whether a money value *can* be attached or ascribed to the injury.

The majority in *Wycko* suggest that the genius of the common law is capable, where left alone, of ascertaining damages even for the sorrow and anguish caused by death. This capacity of the common law should hardly be called genius. It would be more properly described as fiction. What the learned Justice writing in *Wycko* was really recognizing is that, if a jury be told to place a money value on anything, they can by process of speculation, conjecture, and sympathy do what they are told to do. The capacity of the jury to agree on an award is hardly the thing that distinguishes pecuniary losses or injuries from nonpecuniary losses or injuries. The thing that distinguishes the two is the nature of the injury itself as it is regarded by persons who suffer such injuries generally.

Thus, a dejected farmer tells his neighbor that he has suffered the loss of a $50 horse, but he would not tell a neighbor that he has lost a $12,000 wife or a $7,000 son. The majority in *Wycko* tell us, though without citation of judicial authority, finding by the jury, or even reference to sociological handbooks, that companionship is obtainable on the open market. If it be so in Lansing or Ann Arbor, or even in

certain sections of Detroit, it is not a commodity generally bought and sold by the citizens of Michigan.

The *Wycko* majority wrongly assumed that money is the only verity in life, for it concluded that a rule of law which assigns no *monetary* value for the loss of a human life thereby assigns it no value whatsoever. In a classic *non sequitur,* the Court then says, "This kind of delicacy would prevent the distribution of food to the starving because the sight of hunger is so sickening." In truth, of course, a society which values human life in terms greater than money does not count the cost when it feeds the starving. Those, so imbued with adulation of shillings and shekels that they would place a money value on the loss of a human life, would surely weigh the economic wisdom of feeding the starving—placing in the one scale the value of the food, the cost of transportation, and the expense of distribution, and in the other scale, the monetary value of the human lives to be lost through starvation.

Fortunately, our society has not yet come to the stage of enlightened barbarity to which the *Wycko* majority would lead us. We still read of total community mobilization to rescue a little child from the bottom of the well, and the Court can readily take judicial notice that our people do not, as yet at least, measure human life in terms of dollars and cents, nor regard the loss of human life as a mere pecuniary loss.

Having founded its reasoning on the mucky bedrock of dollar deification, the *Wycko* majority assumed that past legislatures and courts have shied away from allowing damages for loss of companionship of a deceased for the reason that it was difficult to arrive at money damages for the loss of human life. It did not occur, apparently, to the majority in *Wycko* that the voice of the people heard in the

legislative hall and their wise forebears on the courts did not believe that the assessment of money damages for the loss of human life was right or prudent or directed to the common welfare.

If one begins with the assumption that all well-being is economic well-being, that all security is economic security, and that all happiness is economic prosperity, it would indeed be difficult to imagine why a legislature or a court would eschew the assessment of money damages for the loss of a life. But in a society where other greater values are recognized, the wisdom of the legislative policy is better understood.

Do we indeed become a stronger and braver, more courageous and more noble people when our citizens are invited to the office of the claims examiner or to the courtroom, there to recover in hard cold cash an amount which will be measured by the sincerity of their keening? Does the *Wycko* decision serve the cause of mental health, or contribute to the personal well-being and good adjustment of our people? Or does the *Wycko* decision and others like it contribute to the growing multitude of patho-litigants whose spurious causes and unreasonable demands congest our courts, delay our dockets and vex our people? Does the *Wycko* decision mean that rich parents with substantial investments in their children's upbringing and education will recover more upon the death of their children than poor parents whose children have been forced by economic adversity to leave school at the age of 16 and help support a large or an impoverished family?

Whatever answer one might give to these questions, the fact that the questions can be asked in good faith is evidence that there is a difference of opinion upon the wisdom of valuing human life in terms of dollars and cents. And if there be a difference of

opinion upon the subject, this Court is, by its constitutional oath, obligated to effectuate the policy determination made by the legislature. The legislative line has been drawn at pecuniary loss and pecuniary injury. The legislature has placed the recovery of pecuniary loss on a level with the administration of decedent's estate. It is a business matter. It is not intended to be a substitute for a church funeral or a publicly financed and privately endowed memorial service.

True it is, that some hard-hearted survivors and avaricious lawyers have in the past and will in the future, by the employment of fiction and fabrication, turn an action for pecuniary loss into an attempt to measure the value of the decedent in order improperly to influence the jury and evoke their sympathy. This is an abuse, and it is an abuse which needs constantly to be guarded against. But it is no solution judicially to decree that the abuse shall be universal and more candidly indulged in. The courts below should be affirmed on the ground that the complaint does not allege a pecuniary injury within the meaning of the death act.

Costs to defendants.

Souris, J. (for affirmance). I concur in affirmance. In this State we have not yet recognized even the right of a child born alive to recover damages for negligently inflicted prenatal injuries. Newman v. City of Detroit (1937), 281 Mich 60. Someday we may overrule Newman in a case which requires our reexamination of Newman's holding. Until we do, I believe it is premature to hold, as we are asked to do today, that a stillborn child's administratrix can sue under the wrongful death act[1] for damages for

[1] CL 1948, § 691.581 et seq. (Stat Ann 1959 Cum Supp § 27.711 et seq.), repealed by PA 1961, No 236, effective January 1, 1963. For currently applicable wrongful death act, see CLS 1961, § 600-

negligently inflicted prenatal injuries which caused the stillbirth. In short, I believe we are being asked to decide too much, too quickly; to move too far, too swiftly; to take two full steps ahead, instead of only one step at a time.

Mr. Justice Kavanagh, writing for the Court in *LaBlue* v. *Specker* (1960), 358 Mich 558, and in his opinion today, has demonstrated exhaustively that courts have not hesitated to consider *in esse* a foetus *en ventre sa mere* whenever to do so would be beneficial to the child born alive. As persuasive as are the cases he cites involving children born alive, when a stillbirth results, as in this case of Powers, there is no live child for whose benefit the courts can act. For this reason the rationale of the cases Justice Kavanagh and plaintiffs rely upon is not applicable when the negligent injury causes a stillbirth. It is true that during this past decade a number of courts in other jurisdictions, not hampered as we are by precedents like *Newman,* have recognized the right to assert a cause of action such as is attempted here; but in none of those cases has a rationale emerged which persuades me of the necessity for, or the wisdom of, the judicial action taken by those courts.

I am not persuaded that such judicial action is necessary to avoid injustice to anyone in being, assuming *arguendo* that we properly might construe our death act's use of the word "person" to include a stillborn child. For example, we are told that the parents of the stillborn child in this very case have instituted suit against the negligent tort-feasors to recover their damages. While it is true that we have not held yet that parents in such common-law tort actions may recover damages for loss of the companionship of their stillborn child, see *Tunni-*

.2922, as amended by PA 1965, No 146 (Stat Ann 1968 Cum Supp § 27A.2922).

*cliffe* v. *Bay Cities Consolidated R. Co.* (1894), 102
Mich 624, this Court in that case recognized that
the mother's right to recover damages for pain and
suffering includes "to some extent a consideration
of the nature of the injury, and cannot exclude from
the consideration of the jury the fact that the phys-
ical and mental suffering of the mother by reason
of such an injury would be more intense than in
the case of the ordinary fracture of a limb." (At
p 630.)  We need not pretend to believe that recover-
able damages, limited as they are by *Tunnicliffe* to
such physical and mental suffering, currently are
commensurate with the loss; but *Montgomery* v.
*Stephan* (1960), 359 Mich 33, and *Wycko* v. *Gnodtke*
(1960), 361 Mich 331, point the way toward our
future development of a more realistic measure of
damages recoverable in the tort actions of the in-
jured parents.  In my judgment, that sort of de-
velopment of our common law is preferable to adding
still another fiction to the law—that for negligently
inflicted prenatal injuries which result in a stillbirth,
the wrongful death act provides a legal remedy for
the "benefit" of the child born dead![2]

BLACK, J. (*for affirmance*).  Until the fourth opin-
ion of this case was turned in December 28 last, hope
remained that we might remove some of the stigma
which, by vote of a bare and now elector-reduced
majority, was branded on all robes of the Court
when *Currie* v. *Fiting,* 375 Mich 440, amended the
then effective and interconnected acts of 1939 (re-
ferring to sections 1 and 2 of Act 297 and section 115
of Act 288)[1] so as to provide damages for loss of

---

[2] For a comprehensive scholarly review of the subject of legal
rights arising from tortious injury to an unborn foetus, see Gordon,
The Unborn Plaintiff, 63 Mich L Rev 579.

[1] Sections 1 and 2, in effect when the causes of *Currie* and *Powers*
allegedly arose (*Currie* 1960 and *Powers* 1962), are cited officially
as CL 1948, §§ 691.581, 691.582.  Section 115, in effect during the

companionship and distribution of such damages to survivors who in no alleged or actual sense were "persons who were dependents of the decedent." But that fourth opinion has left no doubt that a result of this case only can be agreed upon; hence this separate declaration of continued respect for the proposition that judges violate the law when they vote to amend a statute they dare not pronounce unconstitutional.

It seems to the writer that *all* members of the Court, not just some of us, should face openly two aspects of the cause plaintiff alleged and saw dismissed below (see *Powers* v. *City of Troy,* 4 Mich App 572). The first is that if a cause for wrongful death arose at all, that cause came into being when and only when the claimed death occurred (*Coury* v. *General Motors Corporation,* 376 Mich 248). The second is that the cause alleged may proceed to trial, and the damages claimed may be recovered and distributed, *only if authorized by the acts of 1939 as same stood at the time of such claimed death.*

The *Currie* amendment was enacted blithely in face of first branch legislation providing that damages recovered for "pecuniary injury" resulting from wrongful death of a human being, often previously defined as *excluding* damages for loss of companionship,[2] may be distributed—lawfully that is— "only to those persons who were dependents of the decedent." The quotation appears in said section 702.115, sub (4), of which more anon. Now we have

same years, is cited officially as CL 1948, § 702.115. I shall refer herein to said sections 1 and 2 and said section 115 as "the acts of 1939."

The 2 acts had to be conceived and fitted together as mutually dependent by the assembly of 1939; 1938 *Venneman* (*In re Venneman's Estate,* 286 Mich 368) having been just handed down. As noted in *Currie* at 484, the 2 acts were passed by the legislature on the same day, May 25, 1939. They were presented to Governor Dickinson on the same day, June 13, 1939. They were approved on the same day, June 20, 1939.

[2] See authorities gathered in *Currie* at pp 466–470.

before us another demand for another judicial
amendment of these same acts of 1939 (retroactive of
course to 1962 when the collision complained of and
the alleged death of a statutory "decedent" occurred)
which, if enacted by the Court, will provide damages
for loss of the companionship of a fetus which cannot
rationally be said, under statute or otherwise, *as
having left anyone dependent upon it.* Is it not at
long last plain that these insatiable demands for
unconstitutional legislation by Justices will continue
just so long as 5 Justices submit to and appease
them?

*First:* I perceive no reason to consider overruling
inapposite *Newman* v. *City of Detroit,* 281 Mich 60.
For if we were to overrule it, say here and now on
exclusive motion of the Court with declared retro-
activity back to September 1, 1937, that would not
help the present plaintiff. This is an alleged statu-
tory action for wrongful death. It is brought under
and stands or fails by the aforesaid unitary acts of
1939. *Newman,* on the other hand, was an action
brought upon alleged authority of the common law.
It was an action which, if sustainable by the common
law, survived to Charles L. Newman's personal rep-
resentative under the then survival act (CL 1929,
§§ 14040–14060) with the recoverable damages be-
longing exclusively to and becoming a part of the
decedent's estate. The right of a fiduciary to prose-
cute such a common-law right of action did not de-
pend upon proof that the injured person's subsequent
death was due in whole or in part to the injuries
complained of. It was enough that during the de-
cedent's lifetime he became possessed of what was
a property right by the common law, that is, a right
of action for tortiously caused personal injuries.

The sooner this presently composed Court comes
to understand the difference between the mentioned

common-law right of action, and the right of action for recovery and distribution of "pecuniary" damages which by statute has been provided continuously since 1848, the sooner our *total* membership will comprehend that if there were no *Newman Case* in the books the due result of this fiduciary's appeal would necessarily be the same.

Perhaps all this may be made elementarily clear, first by quotation of *Rouse* v. *Michigan U. R. Co.*, 164 Mich 475 (a case where the tortiously injured person lived long enough to recover a judgment for his injuries, only to see it reversed [*Rouse* v. *Michigan U. R. Co.*, 158 Mich 109] and then to die of natural causes); second by quotation of another survival act case, *Love* v. *Detroit, J. & C. R. Co.*, 170 Mich 1.

From *Rouse* at 477:

"A right of action for personal injuries not resulting in the death of the injured person survives his death (CL 1897, § 10117), and a suit for his damages begun by him may be continued by his personal representative after his death, with the same effect, according to the same rules, and to recover the same damages, as if he were living and prosecuting his action in person. Neither the death act, so called (CL 1897, § 10427), nor PA 1905, No. 89, affect such a right of action or have any application to the manner in which it shall be pursued. In the decisions of this Court no different conclusion has been stated or intimated."

From *Love* at 4, 5:

"A right of action is as much property as is a corporeal possession, and, under the survival act, vests at once in the injured person upon the inflicting of the negligent injury, and, upon his subsequent death, becomes an asset of his estate to be collected and distributed in accordance with the administration statutes. *Berger* v. *Jacobs*, 21 Mich 215; *Power*

v. *Harlow,* 57 Mich 107, 111; *In re Joslyn's Estate,*
117 Mich 442; *Carbary* v. *Detroit U. R.,* 157 Mich
683; *Olivier* v. *Railway Co.,* 134 Mich 367 (104 Am
St Rep 607, 3 Ann Cas 53)."

I suggest respectfully that all of us should lay the
*Newman Case* aside for consideration when, if ever,
there is brought here another common-law action by
a prenatally injured living person or, as in *Newman's
Case,* a fiduciary of such a prenatally injured person
whose death has followed his birth.

*Second:* We could write great manuscripts, I sup-
pose, for and against reading into said Act 297 an
intent by the assembly of 1939 to authorize the re-
covery of damages, for "pecuniary injury," by the
appointed fiduciary of a fetus which never attained
birth on account of tortious injury sustained by the
pregnant mother. Justice T. M. Kavanagh has al-
ready undertaken the *pro* side of the argument by
searching beyond our borders for a "trend" which
is said to support his final conclusion that "this
Court should not by a strained construction of the
act[3] defeat its purpose." Here indeed we agree.
We should not by *any* strained construction of the
act defeat its purpose. Nor should we defeat its
purpose as done in *Currie,* that is, by an unconstitu-
tionally ordered retroactive amendment which de-
letes the requirement of distribution "only to those
persons who were dependents of the decedent."

The trouble with Justice T. M. Kavanagh's tour
abroad is that he did not before embarkation ascer-
tain whether the acts of 1939 in any way correspond
with those considered in the out-of-state authorities
he has labored to assemble. He cannot even have

---

[3] I assume that our Brother refers here to the simultaneously
adopted acts of 1939. If he does not, then we must look for au-
thority holding that a fiduciary may recover damages for "pecuniary
injury" which he can distribute lawfully to no one; there being in
this *Powers Case* no "dependents of the decedent."

looked at section 2 of said Act 297, to say nothing of
section 115 of said Act 288, the specific requirement
of which is that damages recovered for "pecuniary
injury" must be distributed only to dependents of
the decedent.

For the benefit of out-of-state readers of our
present indispositions there is appended that part
of said section 115 which applies here (emphasis
supplied by the writer):

"Sec. 115.   The proceeds of any settlement of a
cause of action for wrongful death, or the proceeds
of a judgment recovered in an action for damages
for wrongful death, *shall be distributed in such
manner, to such persons, and in such amounts as
hereinafter set forth:*
    "(1)  * * *
    "(2)  * * *
    "(3)  * * *

    "(4)  After hearing on the petition of the executor
or administrator, the probate court shall enter an
order distributing such proceeds *only to those per-
sons who were dependents of. the decedent* and in
such amounts as to said court shall seem fair and
equitable considering the relative damages sustained
by *each of such dependents* by reason of the de-
cedent's wrongful death:  Provided, however, That
if the proceeds which are to be distributed are pro-
ceeds of a judgment recovered in a court *which has
issued a certificate, as may be provided by law,
relative to the damages sustained by each of such
dependents,* distribution of such proceeds shall, in
the absence of written objections thereto filed by any
interested party following service of notice as re-
quired by this section, be ordered in accordance with
such certificate."

As in *Currie* (375 Mich at pp 471, 484, 485), I
stand for oath-bound duty to apply simply worded
statutes as they read, not as I might have written
them of predilection for a legislative committee.

This plaintiff's cause as alleged, for recovery and distribution of "pecuniary" damages, never arose because there was no "decedent" and no "dependent" as those nouns were known to and used by this Court in *Venneman* and then by the legislators of 1939; legislators who in the same unitary statutes made express provision for recovery of "reasonable compensation for the pain and suffering, while conscious, undergone by such deceased person during the period intervening between the time of the inflicting of such injuries and his death."

*To Summarize:*

1. A fetus cannot be deemed a "person" or a "decedent" within our unique acts of 1939, whereas that conclusion may have been drawn reasonably from some statutes of other States. All the skilled research clerks of Lansing, laboring unitedly without food or drink, could not possibly come up with any judicially interpreted out-of-state statutory provisions which correspond with our acts of 1939. The reason is that those acts were prodded into controversial drafting and effect by the *Venneman Case, supra,* and they are peculiar to Michigan on account of Venneman's determination that, as a result of suit under the then wrongful death statute and entry of a consent judgment for the plaintiff administratrix, an adult son of the deceased husband and father, even though not a dependent of his father, was entitled to share with the decedent's dependent widow the proceeds of that consent judgment. The Court said in *Venneman* (pp 376, 377):

"Because of the statutory mandate, notwithstanding appellant is an adult and in no way dependent upon his father for support, he still is entitled to share in the distribution of the amount recovered. And this is true even though it be admitted that the son himself could have recovered no damages

because he could show no pecuniary loss, and the only person who did suffer a loss was the widow."

It should not be difficult for any present day Michigan lawyer or judge, whether engaged regularly in trial and appellate work in 1939 or not, to perceive both from the content of 1938 *Venneman* and the wording of the immediately ensuing acts of 1939 that the legislature employed the legal phrase "dependents of the decedent" to make sure that no result like *Venneman* should occur again; also that that body tied section 2 of Act 297 and section 115 of Act 288 together by requiring (in section 2) that the probate court "shall determine *as provided by law* the manner in which the amount representing the total pecuniary loss suffered by the surviving spouse and next of kin shall be distributed."

2. This opinion is not to be taken as affecting in any way Mrs. Powers' separately pending common-law action for personal injuries and such other damages as may or may not, at common law, be recoverable by her on account of the stillbirth alleged in her separate complaint. That case doubtless will arrive here and I do not prejudge it. See *Currie* at 486, 487.

I vote to affirm.

T. M. KAVANAGH, J. (*dissenting*). Plaintiff, the administratrix of the estate of Baby Boy Powers, commenced this action against defendants in the Oakland county circuit court on August 28, 1964, seeking damages under the Michigan wrongful death act.[1] Prior to answer, defendants filed a motion for summary judgment alleging the plaintiff's pleadings failed to state a cause of action. After answer and pretrial conference the trial court

---

[1] CL 1948, § 691.581 *et seq.* (Stat Ann 1959 Cum Supp § 27.711 *et seq.*). See, currently, CLS 1961, § 600.2922, as amended by PA 1965, No 146 (Stat Ann 1965 Cum Supp § 27A.2922).

granted defendants' motion for the reason that "a viable baby boy in its sixth month of gestation which is negligently injured  *  *  *  and subsequently stillborn is not a 'person' within the meaning of Michigan's wrongful death act."

Plaintiff appealed to the Court of Appeals, which affirmed the trial court. (4 Mich App 572.) Plaintiff is here on leave granted by this Court on December 30, 1966.

On October 29, 1962, Hazel L. Powers was involved in an automobile accident with a car driven by defendant Ventittelli and owned by defendant City of Troy. At the time she was 6 months pregnant with child. As a result of the accident she and her unborn child each received serious injuries, causing the child to be stillborn.

The first sentence of the Michigan wrongful death act reads as follows:

"Whenever the death of a person or injuries resulting in death, shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action and recover damages, in respect thereof, then and *in every such case,* the person who, or the corporation which would have been liable, if death had not ensued, shall be liable to an action for damages, *notwithstanding the death of the person injured,* and although the death shall have been caused under such circumstances as amount in law to felony." (Emphasis supplied.)

The sole question for decision in this case is whether a 6-month old fetus is a *person* within the meaning of the Michigan wrongful death act.

Defendants rely, as did the trial court and the Court of Appeals, on the case of *Newman* v. *City of Detroit,* 281 Mich 60.

In the *Newman Case* the injuries suffered by the unborn child occurred 22 days prior to his birth and caused his death 3 months after he was born. The Court there denied decedent's cause of action under the survival act, simply stating that *the overwhelming weight of authority denied liability,* and concluded that (p 64):

"Plaintiff has no cause of action under the common law or under any statute."

Plaintiff relies on the great weight of authority which presently exists throughout the nation and contends that although *LaBlue* v. *Specker,* 358 Mich 558 (decided in January, 1960), did not expressly overrule *Newman* v. *City of Detroit, supra,* it did so by implication.

*LaBlue* v. *Specker, supra,* without dissent determined the status of an unborn child as a person entitled to bring an action under the Michigan dramshop act.[2] There the Court pointed out that it and other courts have repeatedly held that for all purposes of construction a child *en ventre sa mere* is considered as a child *in esse* if it would be for the child's benefit to be so considered. It cited the case of *Williams* v. *Marion Rapid Transit, Inc.,* 152 Ohio St 114 (87 NE2d 334, 10 ALR2d 1051),[3] with approval. In that case an unborn child was considered a person within the constitutional provision giving every person a remedy for personal injury. The Court also cited *McLain* v. *Howald,* 120 Mich 274, where it was said (p 279):

"It may be that these statutes do not in terms cover this case, but they are in harmony with the settled rule when they declare that 'posthumous

---

[2] CLS 1961, § 436.22 (Stat Ann 1968 Cum Supp § 18.993).—REPORTER.

[3] Also cited with approval by Justice TALBOT SMITH in *Montgomery* v. *Stephan,* 359 Mich 33, 47.

children are considered as living at the death of their parents.' * * * And it is held that such children may sue for an injury or loss sustained while *en ventre sa mere*. 27 Am & Eng Enc Law, 420, and note. We feel justified, by these authorities, in saying that Edward McLain, being *in esse*, though *en ventre sa mere*, at the time of the death of the life tenant, was entitled to take under the will with his older brothers and sisters."

In *LaBlue* the Court then analogized between the fact situation there and the holdings of this Court and courts of other States under the workmen's compensation statutes. They hold that posthumous children are entitled to compensation due as the result of the death of a parent.

Turning to the holding of courts in the field of criminal law, the Court stated that a child's legal existence *en ventre sa mere* had long been recognized in abortion and other criminal statutes.

The Court then examined how the Michigan Court and other courts construed civil damage or dramshop act provisions.

In *LaBlue* it was pointed out that there had been a change in the weight of authority which affected the *Newman* decision. The Court said (p 570):

"While the statement made by Justice Butzel, in September of 1937 when this case was decided, was true that the overwhelming weight of authority denied liability, the situation with respect to the law has changed considerably since that time."

In pointing out that the law had changed, the Court cited 10 ALR2d 1059, which is an annotation dealing with grounds of action for prenatal injuries. That annotation was published in 1950 and stated that cases dealing with prenatal injuries were few in number and that the numerical weight of authority

denied relief under the various wrongful death statutes. The Court then cited a later annotation found in 27 ALR2d 1256 (published in 1953) which supplemented that in 10 ALR2d, and quoted a portion of that annotation which pointed out the fact that 10 jurisdictions to that date had denied a right of action for prenatal injuries and 7 had allowed such actions. The annotation stated (p 1259):

"However, the fact that 6 jurisdictions out of 7 in the past several years have recognized such an action indicates a definite trend away from the more orthodox view."

The Court then cited many cases from other jurisdictions which point out the drastic change in the law. The *LaBlue* opinion concluded by saying (p 578):

"Assuming that the guardian would be able to prove the facts alleged in his declaration, that John LaBlue had acknowledged that he was the father of Deborah Johnson, and assuming that proof of damage and dependency can be shown, it is clear that a cause of action exists."

With the passage of time and resulting sophistication of judicial precedent and medical knowledge, it is most apparent that the Court in *LaBlue* was absolutely correct in its appraisal of the *Newman Case* in stating that the law had changed considerably since *Newman* had been decided. See *Smith* v. *Brennan,* 31 NJ 353 (157 A2d 497); *Daley* v. *Meier,* 33 Ill App 2d 218 (178 NE2d 691); *Sana* v. *Brown,* 35 Ill App 2d 425 (183 NE2d 187); *Sinkler* v. *Kneale,* 401 Pa 267 (164 A2d 93).

In the case of *Sinkler* v. *Kneale, supra* (decided in September, 1960), the Court was considering a case where a Mongoloid infant brought suit for damages caused when defendant, while negligently oper-

ating his motor vehicle, collided with the car which her mother was driving. The plaintiff at that time was a fetus of one month. As a result of these injuries the child claimed she was born Mongoloid. The Court there reversed an earlier Pennsylvania case showing that the authorities relied upon were cases from other jurisdictions which by that time had reversed themselves, and then upheld the right of action when the child was born alive. The Court then cited a Massachusetts case in which Judge Holmes denied the right of action but felt it necessary to find some opposition to a statement made by Lord Coke on criminal law. Of this the Court in *Sinkler* stated (p 270):

"Even if the criminal law is faint authority for a tort, the foregoing must show at least that the common law offers no bar to the suit. Judge Holmes' real point d'appui for decision was that the unborn child was part of its mother. *This was undoubtedly the medical view accepted by the law at the time, and it is precisely the view that has altered since.*" (Emphasis supplied.)

The Court then gave a detailed consideration of the various jurisdictions and factors pointing out the change in the law (pp 270, 271):

"Since 1949 seven States have overruled former decisions denying recovery, including the four above cited in *Berlin*,[4] and nine States, dealing with the question for the first time, have upheld recovery. The eighteen States that now allow recovery are: (citing States and cases).

"At present eight States deny recovery. In two the courts note the recent trend and strongly indicate that reversal is likely. These are Michigan, in *La-Blue* v. *Specker* (1960), 358 Mich 558, and Wiscon-

---

[4] *Berlin* v. *J. C. Penney Co.* (1940), 339 Pa 547 (16 A2d 28).

son, in *Puhl* v. *Milwaukee Auto Ins. Co.* (1960), 8 Wis 2d 343 (99 NW2d 163). * * *

"Leading text writers have condemned the rule and advocated recovery: (Citing authority). Prosser says that the trend toward allowing recovery 'is so definite and marked as to leave no doubt that this will be the law of the future in the United States.'

"The real catalyst of the problem is the current state of medical knowledge on the point of the separate existence of a fetus. In the *Smith Case* Justice Proctor, speaking for the New Jersey supreme court in a unanimous decision said this [31 NJ 353, 362, 157 A2d 497, 502]:

" 'The third reason for the rule denying recovery was the theory that an unborn child was a part of the mother, and therefore not a person in being to whom a duty of care could be owed. All the courts that have permitted recovery for prenatal injuries have disagreed with that theory. They have found that the existence of an infant separate from its mother begins before birth. * * * *Medical authorities have long recognized that a child is in existence from the moment of conception, and not merely a part of its mother's body.'* (Citing authority.)" (Emphasis supplied.)

The Court concluded by reversing the lower court and remanding the case with a *procedendo.*

The very recent Texas case of *Leal* v. *C. C. Pitts Sand & Gravel,* 419 SW2d 820 (decided October 4, 1967), points out emphatically the definite trend in the law today. The court of appeals' decision in that case (413 SW2d 825) stated that it agreed with the plaintiff's theory and rationale as presented, but thought it was for the legislature or the supreme court to change the rule of law in that State. The supreme court reversed a prior decision of that court and allowed the recovery for the injury to the viable baby who was subsequently born live and then

died. Of the change in the law, the court said (p 822):

"Our research indicates that since this counter trend became evident, no court has denied a right of action for prenatal injuries to a viable infant born alive where the problem has been given re-examination."

In Prosser on Torts (3d ed), ch 10, § 56, p 354, Professor Prosser gives consideration to the field of prenatal injuries. He points out that nearly all the decisions prior to 1946 denied recovery to the child for prenatal injuries—first, because there was no person in existence; and second, because of the difficulty with the proofs. He continues, saying (p 355):

"So far as duty is concerned, if existence at the time is necessary, medical authority has recognized long since that the child is in existence from the moment of conception, and for many purposes its existence is recognized by the law. The criminal law regards it as a separate entity, and the law of property considers it in being for all purposes which are to its benefit, such as taking by will or descent. After its birth, it has been held that it may maintain a statutory action for the wrongful death of the parent. So far as causation is concerned, there will certainly be cases in which there are difficulties of proof, but they are no more frequent, and the difficulties are no greater, than as to many other medical problems. All writers who have discussed the problem have joined in condemning the old rule, in maintaining that the unborn child in the path of an automobile is as much a person in the street as the mother, and in urging that recovery should be allowed upon proper proof."

He goes on to point out that the years of criticism of the rule have finally had their effect and brought about the most "spectacular abrupt reversal" of legal rule in the history of tort law.

Treating the problem of at what stage in embryonic development there should be redress for injuries, Professor Prosser states (pp 356, 357):

"Certainly the infant may be no less injured; and all logic is in favor of ignoring the stage at which it occurs. But with our knowledge of embryology what it is, as we approach the beginning of pregnancy, medical knowledge, and therefore medical testimony and medical proof of causes, becomes increasingly unreliable and unsatisfactory, so that there is good reason for caution. *This, however, goes to proof rather than principle;* and if, as is undoubtedly the case, there are injuries as to which reliable medical proof is possible, it makes no sense to deny recovery on any such arbitrary basis." (Emphasis supplied.)

Professor Prosser then turns directly to the issue in question in this case—that is, whether it makes a difference if the child is born live or is stillborn. He states that the majority of jurisdictions at the time of the printing of his book (1964) are more concerned with compensation for a distressing wrong and allow the action even if the child is stillborn.

We must agree with Professor Prosser that the difficulty of proof while the child is in the mother's womb is no reason to deny recovery. Today the field of medicine is making great strides in this area of prenatal testing.[5]

---

[5] *"Genetic Damage Detected*

"PRENATAL TESTING GAINS

"By Rudy Abramson

"The Los Angeles Times

"ST. LOUIS—Medical science is approaching the ability to clinically identify in the womb many babies which will be born malformed because of genetic damage, a George Washington University researcher has disclosed.

"The technique which has been used clinically in 20 cases with 100 per cent accuracy, involves withdrawing a small specimen of the amniotic fluid surrounding the developing fetus, growing it in tissue culture, then studying the chromosomes which carry the genetic material responsible for heredity.

We are told by Justice O'Hara in his opinion that:

"Considering the plain import of the word 'person' at the time of enactment of our statute and *its uniform interpretation through the years,* we feel obligated to accord to the term its 'ordinary signification' when legislatively employed." (Emphasis supplied.)

The uniform interpretation through the years consists of one decision—that of *Newman* v. *City of Detroit, supra.* We, too, feel obligated to accord the term "its ordinary signification" when legislatively employed, giving the term "person" the same construction the Michigan Supreme Court has given it in workmen's compensation cases, in criminal law, and abortion cases, in descent and distribution of property cases, and in civil damage cases, including the dramshop statute. In all instances save the *Newman Case, supra,* "person" has been interpreted to include a child from the time of conception. In all of the above mentioned instances this Court has found that the legislature used the word "person" to include a fetus from time of conception. Clearly, the legislature used the word "person" with the

"Over the last few years, the technique has been used in 200 or more patients in research conducted by Dr. Cecil B. Jacobson, director of George Washington University's reproductive genetics unit, who described the work in a talk on new developments in human genetics before a science writers symposium here Friday.

"Jacobson said he believes the number of genetic mutations producing malformed children is increasing.

"The technique of withdrawing amniotic fluid from the womb has been available since the 19th century, but the potential for using it is only now being realized with the ability to inspect chromosomes and associate their abnormalities with specific malformations.

"At least eight genetically induced malformations—including such well-known ones as Mongolism and Phenylketonuria (PKU)—can now be identified.

"If the chromosomal analysis of fetal cells from the amniotic fluid should become a widely used procedure in cases where genetic damage is suspected, present abortion laws would presumably permit therapeutic abortion on grounds that to give birth to a child known to be defective would endanger the health of the mother."

(Carried in The State Journal, Lansing, Michigan, on November 20, 1967.)

same meaning in drafting the Michigan wrongful death act.

The word "person" is subsequently used in section 2 of the death act in providing that the damages shall go to those "persons" who may be entitled to such damages when recovered. Since the law of descent and distribution includes unborn children, it should be presumed that the legislature used the term "person" in both sections of the wrongful death act with the same meaning. See *People, ex rel. Simmons,* v. *Township of Munising,* 213 Mich 629, where syllabus 3 says:

"Identical language should receive identical construction when found in the same act."

We do not lightly overrule settled decisions construing any section of a standing statute. The *Newman Case, supra,* is that one decision construing an act which does not approach the dignity of a well-settled interpretation. See *Smith* v. *Lawrence Baking Company,* 370 Mich 169, 177, citing and following *White* v. *Winchester Country Club,* 315 US 32, 40 (62 S Ct 425, 86 L ed 619); and *United States* v. *Raynor,* 302 US 540, 552 (58 S Ct 353, 82 L ed 413). Also, see *Autio* v. *Proksch Construction Company,* 377 Mich 517, where a majority of this Court, including Justice O'HARA—over the dissents of Justices BLACK, KELLY, and DETHMERS—went beyond the one-case rule.

It is, therefore, clear that the *Newman Case* should be and hereby is overruled as its conclusions, regardless of their validity in 1937, are clearly erroneous at this date, there having been an historic change not in theology, but in philosophy, science, medicine, and the law without distinction as to abortion cases, workmen's compensation cases, tort claims including the dramshop act cases, descent and distribution of property or death act cases.

It would be enough that we go no further in the determination of this case, as it is clear (1) that Baby Boy Powers was a person from the time of conception, (2) that he suffered injuries which caused his death, and (3) that if he had survived he would have had a cause of action for the injuries. Our death act states that "in *every* such case, the person who * * * would have been liable, if death had not ensued, shall be liable to an action for damages, *notwithstanding the death of the person injured."* (Emphasis supplied.) The act makes no distinction as to time of death.

Without stopping here, however, we turn our attention to the cases heretofore decided in other jurisdictions that are directly in point with this case. Almost all of the cases are collected in 15 ALR3d 992 in an annotation entitled, "Action for death of unborn child." In section 2 of the annotation, at p 995, are listed 14 jurisdictions which have held that an action may be maintained to recover damages for the wrongful death of an unborn child.[6]

---

[6] Connecticut—*Gorke* v. *Le Clerc* (1962), 23 Conn Supp 256 (181 A2d 448); *Hatala* v. *Markiewicz* (1966), 26 Conn Supp 358 (224 A2d 406).

Delaware—*Worgan* v. *Greggo & Ferrara, Inc.* (1956), 50 Del 258 (128 A2d 557).

Georgia—*Porter* v. *Lassiter* (1955), 91 Ga App 712 (87 SE2d 100).

Iowa—*Wendt* v. *Lillo* (1960, DC Iowa), 182 F Supp 56 (applying Iowa law).

Kansas—*Hale* v. *Manion* (1962), 189 Kan 143 (368 P2d 1).

Kentucky—*Mitchell* v. *Couch* (1955, Ky), 285 SW2d 901.

Louisiana—*Cooper* v. *Blanck* (1923, La App), 39 So 2d 352 (dictum); *Valence* v. *Louisiana Power & Light Co.* (1951, La App) 50 So 2d 847.

Maryland—*State, use of Odham,* v. *Sherman* (1964), 234 Md 179 (198 A2d 71).

Minnesota—*Verkennes* v. *Corniea* (1949), 229 Minn 365 (38 NW2d 838, 10 ALR2d 634).

Mississippi—*Rainey* v. *Horn* (1954), 221 Miss 269 (72 So 2d 434).

New Hampshire—*Poliquin* v. *MacDonald* (1957), 101 NH 104 (135 A2d 249).

Ohio—*Stidam* v. *Ashmore* (1959), 109 Ohio App 431 (11 Ohio Ops 2d 383, 167 NE2d 106).

At page 999 of the annotation, under section 3, are listed 10 jurisdictions which denied liability under the same or similar facts.

For this Court to decide this case as do the shrinking minority of courts today, and as Justice O'Hara would have us do, would be to sanction the turning back of the clock and reverting to judicial and scientific fallacies long since obsolete.

Justice Voelker, writing the majority opinion in *Steger* v. *Blanchard,* 353 Mich 140, 144, said:

"Rules of law are necessary; properly applied they can succinctly gather in the loose ends of a case and help rationalize the decision. Our courts could scarcely operate without them. But when a rule of law or its application becomes so divorced from the context of reality, from the living human situations to which it is sought to be applied, it becomes meaningless incantation and downright harmful."

The prime purpose of the death act was to put an end to the common-law rule that tort-feasors whose acts killed rather than injured their victims would escape liability. The death act was designed to permit recovery even after death. This Court should not by a strained construction of the act defeat its purpose.

Since it is not before the Court at this time, we do not take up the question of damages.

The order of the Court of Appeals affirming the entry of the trial court's summary judgment should be reversed and the case remanded to the circuit court for entry of an order denying motion for summary judgment.

Plaintiff shall have costs.

---

South Carolina—*Fowler* v. *Woodward* (1964), 244 SC 608 (138 SE 2d 42); *Todd* v. *Sandidge Constr. Co.* (1964, CA 4), 341 F2d 75 (applying South Carolina law).

Wisconsin—*Kwaterski* v. *State Farm Mut. Auto. Ins. Co.* (1967), 34 Wis 2d 14 (148 NW2d 107).